MONICA K. HOPPE (Bar # 197576)
HUSCH BLACKWELL SANDERS LLP
1699 Laurelwood Drive
San Jose, CA 95125
Telephone: (408) 829-2889
Facsimile: (402) 964-5050
Email: monica.hoppe@huschblackwell.com

TRENTEN P. BAUSCH (*pro hac vice*)
HENRY L. WIEDRICH (*pro hac vice*)
HUSCH BLACKWELL SANDERS LLP
1620 Dodge Street, Suite 2100
Omaha, NE 68102
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
Email: trent.bausch@huschblackwell.com, henry.wiedrich@huschblackwell.com

Attorneys for Plaintiff
GALLUP, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GALLUP, INC.,<br><br>           Plaintiff,<br><br>    vs.<br><br>BUSINESS RESEARCH BUREAU (PVT.) LTD., d/b/a GALLUP PAKISTAN, IJAZ SHAFI GILANI, GALLUP BUSINESS RESEARCH SERVICES (PVT.) LTD., d/b/a GALLUP PAKISTAN, and GALLUP PAKISTAN (PVT.) LTD.<br><br>           Defendants. | Case No.  CV 08-1577   WHA<br><br>Honorable William H. Alsup<br><br>**FIRST AMENDED COMPLAINT FOR FEDERAL  TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND DILUTION; AND CALIFORNIA UNFAIR COMPETITION AND UNJUST ENRICHMENT**<br><br>**(INJUNCTIVE RELIEF SOUGHT)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Gallup, Inc. complains against Defendants Business Research Bureau (Pvt.) Ltd. (d/b/a Gallup Pakistan), Ijaz Shafi Gilani, Gallup Business Research Services (Pvt.) Ltd. (d/b/a Gallup Pakistan), and Gallup Pakistan (Pvt.) Ltd. as follows:

## INTRODUCTION

1.      Gallup, Inc. ("Gallup") is the owner of the world famous GALLUP trademarks and service marks.  For over 70 years, the GALLUP marks have been used and recognized in connection with surveys for political or public opinion polls and corresponding data and analysis. In addition, the GALLUP marks also identify Gallup as the source of surveys and opinion polls directed to business management.  As a result, the GALLUP marks have become distinctive symbols of excellence and innovation uniquely associated with Gallup and its surveys and opinion polls.

2.      Defendants Business Research Bureau (Pvt.) Ltd. ("BRB"), Gallup Business Research Services (Pvt.) Ltd. ("GBRS"), and Gallup Pakistan (Pvt.) Ltd. ("Gallup Pakistan Ltd.") under the guidance of their chairman, Defendant Ijaz Shafi Gilani ("Gilani"), in bad faith and in violation of a Pakistani Registrar of Trade Marks decision, as well as Gallup's exclusive rights, do business under the name Gallup Pakistan and operate as an opinion and socio-economic research organization, providing survey and opinion polls on political topics and topics pertinent to business management decisions.  In January and February 2008, Defendants released and promoted polls containing information on Pakistani public opinion on issues surrounding the upcoming Pakistani elections.  These polls bore the mark GALLUP PAKISTAN.  Due to recent events in Pakistan and the election's implications on United States foreign policy, the Pakistani parliamentary election and Defendants' poll results garnered much attention from the press in the

1    United States and abroad and were widely printed. In these publications, the polls were

2    attributed to Gallup Pakistan or simply Gallup. Further, Defendant Gilani has appeared on radio

3    and internet broadcasts in the United States discussing the Pakistani parliamentary election and

4    the BRB, GBRS, and Gallup Pakistan Ltd. poll results. Defendant Gilani has also appeared in

5    the United States, giving presentations on papers and poll results that bear the mark GALLUP.

6    Defendants' unauthorized use of the GALLUP mark in association with business and political

7    surveys is an attempt to bolster the credibility of its services. Further, Defendants' use of the

8    GALLUP mark creates a misleading association with Gallup's internationally recognized

9    goodwill and reputation in the trade.

10    **JURISDICTION, VENUE, AND INTRA-DISTRICT ASSIGNMENT**

11    3.    Plaintiff's first, second, and third claims arise under the Trademark Act of 1946

12    (the Lanham Act), as amended by the Federal Trademark Dilution Act of 1995 (15 U.S.C. §§

13    1051, *et seq.*). This Court has subject matter jurisdiction over such claims pursuant to 28 U.S.C.

14    §§ 1338(a) and 1338(b) (trademark and unfair competition), 28 U.S.C. § 1331 (federal question),

15    and 15 U.S.C. § 1121 (Lanham Act). This Court also subject matter jurisdiction over all of

16    Plaintiffs claims pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists

17    between the parties. Even absent diversity jurisdiction, this Court has supplemental jurisdiction

18    over the remaining state law claims under 28 U.S.C. § 1367.

19    4.    This Court has personal jurisdiction over Defendants.

20    5.    Venue is proper in this Court under 28 U.S.C. § 1391(d) because Defendants are

21    all aliens.

22    6.    Intra-district assignment to any division of the Northern District is proper under

23    Local Rule 3-2(c) and the Assignment Plan of this Court as an "Intellectual Property Action."

24

## PARTIES

7.    Gallup is a Delaware corporation with its principal place of business at 1001 Gallup Drive, Omaha, Nebraska 68102.

8.    Upon information and belief, Defendant BRB is a Pakastani company with its principal place of business at H-45, St, 52, F-7/4, Islamabad, Pakistan.  Defendant BRB, in bad faith and in violation of a Pakistani Registrar of Trade Marks decision, as well as Gallup's exclusive rights, does business under the name Gallup Pakistan and operates as an opinion and socio-economic research organization, providing survey and opinion polls on political, social, and business topics.

9.    Upon information and belief, Defendant GBRS is a Pakastani company with its principal place of business at H-45, St, 52, F-7/4, Islamabad, Pakistan.  Defendant GBRS, in bad faith and in violation of a Pakistani Registrar of Trade Marks decision, as well as Gallup's exclusive rights, does business under the name Gallup Pakistan and operates as an opinion and socio-economic research organization, providing survey and opinion polls on political, social, and business topics.

10.    Upon information and belief, Defendant Gallup Pakistan Ltd. is a Pakastani company with its principal place of business at H-45, St, 52, F-7/4, Islamabad, Pakistan. Defendant Gallup Pakistan Ltd., in bad faith and in violation of a Pakistani Registrar of Trade Marks decision, as well as Gallup's exclusive rights, does business under the name Gallup Pakistan and operates as an opinion and socio-economic research organization, providing survey and opinion polls on political, social, and business topics.

11.    Upon information and belief, Defendant Gilani is Chairman and Chief Executive of BRB, GBRS, and Gallup Pakistan Ltd. and is a resident of Islamabad, Pakistan.  Upon further

information and belief, Defendant Gilani obtained a Ph.D. in Political Science from the Massachusetts Institute of Technology (MIT) in 1977, and became Chairman of BRB, GBRS, and Gallup Pakistan Ltd., organizations he helped found, in 1980. Upon further information and belief, Defendant Gilani is also a professor of International Relations at the International Islamic University Islamabad.

12.    Upon information and belief, Defendants provide or have provided public opinion studies to international agencies headquartered in the United States, including the World Bank, headquartered in Washington, D.C., and UNICEF, which is headquartered in New York City, New York, as well as educational institutions located in the United States, including Harvard University and the Massachusetts Institute of Technology (MIT), both located in Boston, Massachusetts. Upon further information and belief, Defendants BRB, GBRS, and Gallup Pakistan Ltd. have provided public opinion studies and research to Pakistani and international businesses.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### The GALLUP Marks

13.    Gallup and its predecessors in interest or related entities have offered and promoted its services in connection with its family of GALLUP trademarks and service marks in the United States since 1935.

14.    Gallup owns numerous United States Trademark registrations and applications incorporating the GALLUP mark for use in connection with surveys, public opinion polls, business management consulting, as well as other goods and services. These registrations and applications for GALLUP marks include:

| Mark | Application No. | Registration No. | Goods/Services | Status |
|------|-----------------|------------------|----------------|--------|

| The Gallup Poll | 73,317,712 | 1,266,004 | Public opinion polling. | Registered |
|---|---|---|---|---|
| The Gallup School | 75,227,740 | 2,220,843 | Educational services . . .in the field of polling techniques, methodology, and the interpretation of polling results. | Registered |
| Gallup | 75,234,811 | 2,242,387 | Public opinion polling services | Registered |
| Dr. Gallup Portrait Devise | 75,697,793 | 2,355,074 | Market research services; opinion polling for business marketing purposes. | Registered |
| Gallup Management Journal | 76,137,553 | 2,565,129 | Magazines and periodicals, namely, journals relating to matters of interest to management. | Registered |
| The Gallup Path | 76,376,913 | 2,942,443 | Business Management Consulting Services. | Registered |
| Gallup | 78,321,159 | 3,004,998 | Printing material (Cl. 16); Business management and consulting services (Cl. 35); Educational services (Cl. 41); and Scientific research services (Cl. 42). | Registered |
| Gallup Consulting | 78,752,029 | 3,158,038 | Printing material (Cl. 16); Business management and consulting services (Cl. 35); Educational services (Cl. 41); and Scientific research services (Cl. 42). | Registered |
| Gallup Press | 78,751,995 | 3,158,034 | Printing material (Cl. 16); and Educational services (Cl. 41). | Registered |
| Gallup University | 78,751,931 | 3,158,032 | Printing material (Cl. 16); Business management and consulting services (Cl. 35); Educational services (Cl. 41); and Scientific research services (Cl. 42). | Registered |

| Gallup-Healthways Well Being Index | 77,363,409 | Questionnaires and surveys to gather and interpret data to help measure quality of well being (Cl. 16); Consultation in improving the quality of well being (Cl. 35); and Conduct public opinion polling and surveys of general population on well being (Cl. 42). | Pending |
|---|---|---|---|

15.    Gallup has used, continues to use, or maintains a bona fide intent to use the referenced GALLUP marks in connection with the various goods and services as shown in the chart above and/or as shown in the corresponding registrations or applications.

16.    Gallup has also registered the GALLUP mark with United States Customs & Border Protection, under customs recordation number TMK 06-00283.

17.    For over 70 years, Gallup has invested and continues to invest substantial resources in promoting its goods and services in connection with the GALLUP marks—specifically including surveys, public opinion polls, and business management consulting services.

18.    As a result of Gallup's use and promotion of the GALLUP marks in conjunction with its high quality goods and services, the GALLUP marks have acquired a strong and favorable public recognition and distinctiveness identifying Gallup as the source of surveys, public opinion polling, and business management consulting services of the highest quality, credibility and reliability.

19.    Through widespread and continuous use, advertisement, and promotion by Gallup, the trade and purchasing public recognize that Gallup is the source of surveys, public opinion polling, business management consulting services, and related goods identified by and

1   used in connection with the GALLUP marks.

2       20.    As a result of extensive use and promotion by Gallup, the GALLUP marks have

3   become famous and distinctive marks of incalculable value uniquely associated with Gallup and

4   the high quality, credibility and reliability of its goods and services.

5       21.    The GALLUP marks are famous and became famous decades prior to any use of

6   the term by Defendants.

7                    **Defendants' Unauthorized Use of the GALLUP Mark**

8       22.    Upon information and belief, Defendants BRB, GBRS, and Gallup Pakistan Ltd.,

9   guided by their chairman, Defendant Gilani, operate as an opinion and socio-economic research

10  organization, providing survey and opinion polls on political, social, and business topics.

11      23.    Upon information and belief, Defendants BRB, GBRS, and Gallup Pakistan Ltd.

12  use the mark GALLUP in their trade name, Gallup Pakistan, and prominently display the

13  GALLUP mark on their publications and website.

14      24.    Defendants attempted to register the GALLUP mark in Pakistan, under

15  Application No. 124363 to the Trade Marks Registry, with respect to paper and paper articles,

16  cardboard and cardboard articles, printed matter, programme schedule, newspapers, magazines,

17  periodicals, reports, evaluations, diagrams, charts, print-outs, instructional manuals, survey

18  questionnaires, interview doing charts, compilations, books, bookbinding material, photographs,

19  stationery, bags, envelops, adhesive materials, artists materials, typewriters and office requisites,

20  printed promotional material within class 16, instructional and teaching material, playing cards,

21  and stereotype.

22      25.    In the case before the Registrar of Trade Marks at Karachi, captioned *In the*

23  *matter of Opposition No. 56/1999 to Application No. 124363 in class 16 for the Trade Mark*

24

1    *GALLUP* ("*Opposition No. 56/1999*"), Gallup opposed Defendants' attempted registration and

2    requested that Gallup's own application to register the GALLUP mark in Pakistan be granted.

3           26.    In *Opposition No. 56/1999*, the Registrar of Trade Marks of Pakistan refused

4    Defendants' application to register the mark GALLUP and allowed Gallup's application to

5    register the mark GALLUP to proceed to registration.   A copy of the Registrar's decision is

6    attached hereto as Exhibit A.

7           27.    In *Opposition No. 56/1999*, the Registrar of Trade Marks of Pakistan found as

8    follows:

9           a.     "The adoption of the mark GALLUP by [Defendants] is dishonest [and]

10          fraudulent.   [Defendants] had prior knowledge that rights in the trade mark GALLUP

11          vests exclusive with [Gallup]."

12          b.     "[Defendants] has no justification to adopt the well known trade mark of

13          the foreign company in its name."

14          c.     "The attempt of securing registration of the mark GALLUP by

15          [Defendants] is an attempt to capitalize [on] [Gallup's] mark GALLUP."

16          d.     "Since the adoption of the trade mark GALLUP by [Defendants] is

17          malafide, therefore any use of the said mark in Pakistan does not support to [Defendants]

18          and such dishonest use can not [sic] be protected in the law."

19          e.     "There is every likelihood of confusion and deception if [Defendants']

20          mark is allowed to proceed to registration."

21          28.    Upon information and belief, despite Defendants' failed attempt to register the

22   mark GALLUP in Pakistan and Gallup's success in doing so, Defendants have continued using

23   and prominently featuring the mark GALLUP in connection with its services and publications.

24

Gallup, Inc. v. BRB, Gilani, GBRS, and Gallup Pakistan Ltd.
Case No. CV 08-1577  WHA

29.    Upon information and belief, Defendants maintain a website found at http://gallup.com.pk.  Upon further information and belief, Defendants' website is maintained in English, is accessible by individuals and entities in the United States, and prominently displays links to the results of its public opinion polls on its home page.  A copy of Defendants' homepage is attached as Exhibit B and is incorporated by reference.

30.    At Defendants' website, Defendants market their services and release the results of their surveys and polls of Pakistani public opinion on political, social and business topics.  Upon information and belief, Defendants disseminate the results of these polls to the public and press, free of charge.

31.    Upon information and belief, Defendants' press releases of their polls prominently feature the GALLUP mark.  A copy of Defendants' press release of January 11, 2008 is attached as Exhibit C.

32.    Upon information and belief, between January 11, 2008 and February 22, 2008, Defendants released six polls regarding Pakistani public opinion of issues surrounding the Pakistani parlimentary elections and Pakistan's President Pervez Musharraf.  The results of these six polls each bore the mark GALLUP and were made available to the public and press at Defendants' website.  A copy of Defendants' press release of February 11, 2008 is attached as Exhibit D.  A copy of Defendants' press release of February 15, 2008 is attached as Exhibit E.  A copy of Defendants' press release of February 18, 2008 is attached as Exhibit F.  A copy of Defendants' press release of February 21, 2008 is attached as Exhibit G.  A copy of Defendants' press release of February 22, 2008 is attached as Exhibit H.

33.    Due to recent events in Pakistan, including the assassination of Benazir Bhutto, and the election's implications on United States foreign policy, the Pakistani parliamentary

1    election and the polls released by Defendants garnered much attention from the press in the

2    United States and abroad.

3       34.     The results of Defendants' polls, all bearing the mark GALLUP, were published

4    by the following news organizations in the United States, either in print or electronic form, or

5    both:

6            a.       ABC News (Associated Press), January 13, 2008.

7            b.       Bloomberg, Feb. 21, 2008.

8            c.       The Boston Globe (Reuters), February 13, 2008.

9            d.       The Christian Science Monitor, February 8, 2008.

10            e.       The Christian Science Monitor, February 15, 2008.

11            f.       CNN, February 15, 2008.

12            g.       Los Angeles Times, February 14, 2008.

13            h.       New York Times, January 22, 2008.

14            i.       PR News Wire, Feb. 13, 2008.

15            j.       Reuters, February 7, 2008.

16            k.       Reuters, February 19, 2008.

17            l.       Seattle Times, February 18, 2008.

18            m.       Time, January 24, 2008.

19            n.       Time, February 13, 2008.

20            o.       USA Today (Associated Press), January 13, 2008.

21            p.       USA Today, February 14, 2008.

22            q.       The Week, January 25, 2008.

23       35.     Upon information and belief, Defendants' poll results, with their accompanying

24

1    unauthorized use of the GALLUP mark, were also widely published by the international press.

2        36.    The reason Defendants' poll results garnered the media attention they did was

3    because people in the media believed the poll results were associated with Gallup.

4        37.    Upon information and belief, not only were Defendants' poll results widely

5    published under the GALLUP mark, but Defendant Gilani affirmatively promoted and discussed

6    the poll results with National Public Radio (NPR), headquartered in Washington, D.C., as well as

7    in an internet-broadcast teleconference with the Center for Strategic International Studies, also

8    headquartered in Washington, D.C.

9        38.    On NPR's Morning Edition on February 12, 2008, Jackie Northam reported from

10   Islamabad, Pakistan as follows:

11       Jackie Northam: "Dr. Ijaz Gilani heads up the Pakistani chapter of the Gallup polling

12   organization.  Gilani says his group asked the Pakistanis if they felt Musharraf was critical in

13   helping stamp out terrorism."

14       Defendant Gilani: "When we frame a question such as this, that would Musharraf's

15   departure be helpful or hurt the control of terrorism, close to 70 percent said that if Musharraf

16   leaves, controlling terrorism would become easier."

17       Jackie Northam: "Musharraf has said he would resign only when he felt the people of

18   Pakistan didn't want him in power anymore.  The recent polls may indicate that time has come."

19       39.    Upon information and belief, on February 15, 2008, Defendant Gilani participated

20   in a teleconference event of the Center for Strategic & International Studies, entitled "Pakistan's

21   Elections: Free, Fair, and Safe?  Pre-Election Analysis."  Upon further information and belief,

22   the teleconference was broadcast over the internet and the audio file of the broadcast can be

23   found at http://www.csis.org.  At the teleconference, Defendant Gilani was introduced as the

24

1  "Chairman of Gallup Pakistan" and Defendant Gilani discussed Defendants' poll results, as well

2  as the history of elections in Pakistan.

3      40.    Upon information and belief, Defendant Gilani has also appeared in the United

4  States, giving presentations on papers and poll results which bear the GALLUP mark.

5      41.    Upon information and belief, between February 28 to March 3, 2007, Defendant

6  Gilani appeared at the International Studies Association 2007 Annual Convention in Chicago,

7  Illinois and presented a paper entitled "Reflections on Americanism and Anti-Americanism."

8  The title page of the paper bore the GALLUP mark.  A copy of Defendant Gilani's "Reflections

9  on Americanism and Anti-Americanism" is attached as Exhibit I.

10      42.    Upon information and belief, on March 27, 2008, Defendant Gilani again

11  participated at the International Studies Association 2008 Annual Convention in San Francisco,

12  California.

13      43.    Gallup—the true owner of the famous GALLUP marks—did not perform any

14  surveys or opinion polls of Pakistani public opinion leading up to the Pakistani elections.

15      44.    Upon information and belief, Defendants' decision to use the GALLUP mark in

16  connection with its surveys and polls was done with the intent to capitalize upon the fame and

17  recognition of the famous GALLUP marks, and the associated credibility, reliability and

18  goodwill, in connection with the business of Gallup—namely, the provision of public opinion

19  polls and business management consulting—that have been associated with the GALLUP marks

20  for over 70 years.

21      45.    Defendants knew or reasonably should have known that the distribution and

22  promotion of survey and poll results under a GALLUP mark in the United States and elsewhere

23  would create the likelihood of confusion among consumers as to the source, affiliation,

24

1  connection, origin, authorization and sponsorship of the surveys and polls and would dilute the

2  distinctive quality of the GALLUP mark.

3        46.    Defendants knew or reasonably should have known that the distribution and

4  promotion of survey and poll results under a GALLUP mark would create the false impression in

5  the minds of consumers and readers of the poll results that Defendants' surveys and polls were

6  conducted by Gallup, a recognized leader in both opinion polling and business management

7  consulting.

8                              **Injury to Gallup and the Public**

9        47.    Defendants' use of the GALLUP mark in connection with an opinion poll or

10 survey in the area of business management or political or socio-economic opinion will falsely

11 indicate to consumers that Defendants' surveys and polls originate from, are approved by,

12 sponsored by, licensed by, or otherwise affiliated with Gallup and are associated with the opinion

13 polls, surveys, and/or management consulting offered in connection with the GALLUP family of

14 marks.

15       48.    Upon information and belief, Defendants' use of the GALLUP mark in

16 connection with opinion polls, surveys, and management consulting occurs  in the same markets

17 and channels of trade as those offered by Gallup under the GALLUP family of marks.

18       49.    Defendants' use of GALLUP as described above has caused or is likely to cause

19 confusion, to cause mistake, or to deceive customers of both Gallup and the Defendants and to

20 cause the dilution of the distinctive quality of the GALLUP mark.

21       50.    Defendants' use of GALLUP as described above has or will unjustly enrich

22 Defendants at the expense of Gallup and its goodwill in the GALLUP marks.

23       51.    Defendants' use of GALLUP as a trademark as described above removes Gallup's

24

1   ability to control the nature and quality of goods provided in connection with the GALLUP

2   marks, and places its valuable reputation and goodwill beyond its control and into the hands of a

3   remote company with the distribution capability to damage the famous GALLUP marks

4   worldwide.

5       52.    Upon information and belief, Defendants' actions to infringe and dilute the

6   trademark rights of Gallup were willful in that Defendants had knowledge of Gallup's famous

7   GALLUP family of marks and acted in reckless disregard of the likelihood of confusion and

8   dilution that would result from its use of the GALLUP mark in connection with their poll results.

9       53.    Unless restrained by this Court, Defendants' unlawful acts will cause or continue

10  to cause irreparable injury to Gallup and to the public, for which there is no adequate remedy at

11  law.

## FIRST CLAIM
## FEDERAL TRADEMARK INFRINGEMENT
### (15 U.S.C. §§ 1114-1117; Lanham Act § 32)

14      54.    Gallup realleges and incorporates by reference the foregoing paragraphs of its

15  Complaint as if fully set forth herein.

16      55.    Defendants' actions, as set forth above, and Defendants' use of the mark

17  GALLUP constitutes or will constitute infringement of Gallup's registered trademarks in

18  violation of the Lanham Act, 15 U.S.C. § 1114 and entitle Gallup to an injunction against said

19  use pursuant to 15 U.S.C. § 1116.

20      56.    As a direct and proximate result of Defendants' infringing activities, Gallup has

21  been or will be irreparably harmed and damaged.  Gallup's remedies at law are inadequate to

22  compensate for this harm and damage.

23      57.    Defendants' infringement of Gallup's trademarks as alleged herein is an

24

exceptional case and was intentional, entitling Gallup to treble its actual damages and to an award of attorneys' fees under 15 U.S.C. §§ 1117(a) and 1117(b).

**SECOND CLAIM**
**FEDERAL UNFAIR COMPETITION**
**(False Designation of Origin and False Description)**
**(15 U.S.C. § 1125(a); Lanham Act § 43(a))**

58.     Gallup realleges and incorporates by reference the foregoing paragraphs of its Complaint as if fully set forth herein.

59.     Defendants' actions, as set forth above, and Defendants' use of the mark GALLUP constitutes or will constitute a false representation or designation of origin that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association with Gallup, or as to the origin, sponsorship, or approval of Defendants' goods and/or services by Gallup.  Such actions constitute unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125.

60.     As a direct and proximate result of Defendants' infringing activities, Gallup has been or will be irreparably harmed and damaged.  Gallup's remedies at law are inadequate to compensate for this harm and damage.

**THIRD CLAIM**
**FEDERAL DILUTION OF FAMOUS MARKS**
**(Federal Trademark Dilution Act of 1995)**
**(15 U.S.C. § 1125(c); Lanham Act § 43(c))**

61.     Gallup realleges and incorporates by reference the foregoing paragraphs of its Complaint as if fully set forth herein.

62.     Gallup's family of GALLUP trademarks are distinctive and famous within the meaning of the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c), as amended.

63.     Defendants' actions, as set forth above, and Defendants' use of the mark

1    GALLUP has caused actual dilution and will continue to cause dilution of the distinctive quality

2    of Gallup's famous GALLUP marks in violation of the Federal Trademark Dilution Act of 1995,

3    15 U.S.C. § 1125(c).

4         64.    By reason of the foregoing, Gallup has been or will be irreparably harmed and

5    damaged. Gallup's remedies at law are inadequate to compensate for this harm and damage.

6         65.    Because Defendants willfully intended to trade on Gallup's reputation or to cause

7    dilution of Gallup's famous trademarks, Gallup is entitled to damages, extraordinary damages,

8    fees, and costs pursuant to 15 U.S.C. § 1125(c)(2).

9    **FOURTH CLAIM**
     **CALIFORNIA UNFAIR COMPETITION**

10   **(Cal. Bus. & Prof. Code § 17200)**

11        66.    Gallup realleges and incorporates by reference the foregoing paragraphs of its

12   Complaint as if fully set forth herein.

13        67.    Defendants' infringement of Gallup's trademarks constitutes "unlawful, unfair or

14   fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising"

15   within the meaning of California Business & Professions Code § 17200.

16        68.    As a direct and proximate result of Defendants' infringing activities, Gallup has

17   been or will be irreparably harmed and damaged. Gallup's remedies at law are inadequate to

18   compensate for this harm and damage.

19        69.    As a consequence of Defendants' actions, Gallup is entitled to injunctive relief

20   and an order that Defendants disgorge all profits earned as a result of Defendants' infringing use

21   of the GALLUP mark.

22   **FIFTH CLAIM**
     **COMMON LAW UNJUST ENRICHMENT**

23        70.    Gallup realleges and incorporates by reference the foregoing paragraphs of its

24

1    Complaint as if fully set forth herein.

2    71.    Defendants' actions as set forth above and Defendants' use of the mark GALLUP

3    provided a benefit to Defendants at the expense of Gallup.

4    72.    Defendants had knowledge and appreciation of the benefit conferred upon

5    Defendants by their conduct.

6    73.    It would be inequitable for Defendants to retain the benefit without paying

7    Gallup.

8    **PRAYER FOR RELIEF**

9    WHEREFORE, Gallup prays that this Court grant it the following relief:

10    1.    Adjudge that Gallup's trademarks have been infringed by Defendants in violation

11    of Gallup's rights under common law and 15 U.S.C. § 1114.

12    2.    Adjudge that Defendants have competed unfairly with Gallup in violation of

13    Gallup's rights under common law, 15 U.S.C. § 1125(a), and/or California law.

14    3.    Adjudge that Defendants' activities are likely to, or have, diluted Gallup's famous

15    trademarks in violation of Gallup's rights under common law and 15 U.S.C. § 1125(c).

16    4.    Order that Defendants, as well as their  affiliates, officers, agents, servants,

17    employees, attorneys, successors, assigns, and all those persons in active concert or participation

18    with any of them, be enjoined and restrained, at first during the pendency of this action and

19    thereafter permanently, from:

20    a.    Using, in connection with the promotion, advertising, offering, or sale of

21    any opinion poll, survey, or consulting services, the mark GALLUP or any other

22    designation that is confusingly similar to GALLUP or any of the GALLUP marks; is

23    likely to cause confusion with the GALLUP marks; or dilutes or is likely to dilute the

24

GALLUP marks.

b.    Utilizing the internet domain name, gallup.com.pk, for their internet website.

c.    Otherwise competing unfairly with Gallup in any manner including (1) adopting or infringing upon Gallup's GALLUP marks, or (2) adopting or using any other marks or designations that are confusingly similar to the GALLUP marks.

d.    Conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to above.

5.    Order Defendants to immediately remove all references to Gallup or the GALLUP marks from Defendants' corporate or trade name and from any survey, website, brochure, newsletter, publication or any other advertising, marketing, or promotional material of Defendants.

6.    Order Defendants to deliver up for destruction or show proof of destruction of any and all products, advertisements, publications, labels and any other materials in their possession or control that depict or reference the mark GALLUP in connection with the goods and/or services of the Defendants.

7.    Order Defendants to provide notice or corrective advertising to each and every known reader or recipient of the Defendants' recent survey and poll results to disclaim any association, affiliation, endorsement, or approval by Gallup with respect to the GALLUP marks.

8.    Order Defendants to file with this Court and to serve upon Gallup a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with any injunction resulting from this matter within thirty days after service of such injunctions.

9.    Adjudge that Gallup recover from Defendants its damages in an amount to be proven at trial.

10.    Order an accounting be directed to determine Defendants' profits or increases in revenue or recognition resulting from its acts of infringement, dilution, unfair competition, and unjust enrichment, and impose a constructive trust on all of Defendants' funds and assets that arise out of Defendants' infringing activities.

11.    Adjudge that Defendants be required to account for any profits that are attributable to their illegal acts, and that Gallup be awarded the greater of three times Defendants' profits or three times any damages sustained by Gallup, under 15 U.S.C. § 1117, plus prejudgment interest.

12.    Adjudge that Defendants be required to pay Gallup punitive damages for their oppression, fraud, malice, and gross negligence, whether grounded on proof of actual damages incurred by Gallup or on proof of Defendants' unjust enrichment.

13.    Adjudge that Gallup be awarded its costs incurred in pursuing this action, including reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

14.    Order all such other relief as the Court deems appropriate.


Dated this 22nd day of August, 2008.

                    Respectfully submitted,

                    By: _____
                    Monica K. Hoppe (Bar # 197576)
                    HUSCH BLACKWELL SANDERS LLP
                    1699 Laurelwood Drive
                    San Jose, CA 95125
                    Telephone:  (408) 829-2889
                    Facsimile:  (402) 964-5050
                    Email: monica.hoppe@huschblackwell.com

1

2 Trenten P. Bausch (*pro hac vice*)
 Henry L. Wiedrich (*pro hac vice*)
3 HUSCH BLACKWELL SANDERS LLP
 1620 Dodge Street, Suite 2100
4 Omaha, NE  68102
 Telephone:  (402) 964-5000
5 Facsimile:  (402) 964-5050
 Email:  trent.bausch@huschblackwell.com,
6     henry.wiedrich@huschblackwell.com

7 Attorneys for Plaintiff
 GALLUP, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## DEMAND FOR JURY TRIAL

2

Gallup demands that this action be tried to a jury.

3

4

Dated this 22 nd day of August, 2008.

5

Respectfully submitted,

6

By: _Monica Hoppe_

7

Monica K. Hoppe (Bar # 197576)
HUSCH BLACKWELL SANDERS LLP

8

1699 Laurelwood Drive
San Jose, CA 95125

9

Telephone: (408) 829-2889
Facsimile: (402) 964-5050

10

Email: monica.hoppe@huschblackwell.com

11

Trenten P. Bausch (*pro hac vice*)
Henry L. Wiedrich (*pro hac vice*)

12

HUSCH BLACKWELL SANDERS LLP
1620 Dodge Street, Suite 2100

13

Omaha, NE 68102
Telephone: (402) 964-5000

14

Facsimile: (402) 964-5050
Email: trent.bausch@huschblackwell.com,
          henry.wiedrich@huschblackwell.com

15

16

Attorneys for Plaintiff
GALLUP, INC.

17

18

19

20

21

22

23

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the _22_ nd day of August, 2008, I electronically filed the foregoing Amended Complaint with the Clerk of the Court using the CM/ECF system and provided service of the foregoing Amended Complaint by United States Express Mail, proof of delivery, postage prepaid, and by electronic mail on August 22, 2008, to:

Dr. Ijaz Shafi Gilani

Post Office Box #1055

Islamabad, Pakistan

umer.gilani@gmail.com

Dated this _22_ nd day of August, 2008.

By: _Monica Hoppe_

Monica K. Hoppe
Counsel for Plaintiff Gallup, Inc.

BEFORE THE REGISTRAR OF THE TRADE MARKS AT KARACHI

OPPOSITION NO. 56/1999

In the matter of Opposition No. 56/1999 to Application No.124363
in class 16 for the Trade Mark GALLUP in the name of

M/s. Gallup Business Research Services          ...          The Applicant
(Pvt.) Limited

By

M/s. GALLUP, INC.                ...          The Opponent

Present :       Mr. Tauqeer Ahmed Khan Advocate on behalf of the
                Applicant.

                Mr. Muhammad Bashir Abbasi Advocate of Vellani &
                Vellani on the behalf of the Opponent.

DECISION

The above opposition has been filed against the registration
of the trade mark GALLUP in the name of Gallup Business Research
Services (Pvt.) Limited, (A Pakistani company), Shaheen Chambers, A/4,
Commercial Area, Block 7 & 8, K.C.H. Society, Karachi (hereinafter
referred to as "the Applicant") by GALLUP, INC., a corporation organised
and existing under the laws of the State of Delaware, United States of
America, Merchants, of 301 S. 68th Street Place, Lincoln, NB 68510,
United States of America (hereinafter referred to as "the Opponent").

The brief facts leading to this Opposition as narrated by the
Opponent in its notice of opposition are as follows:-

Exhibit
A

2

The Opponent has been carrying on its business for over sixty years from the United States of America and elsewhere either directly or through its affiliates and subsidiaries, as merchant of a variety of products falling in class 16 of the International Classification of Goods.

The Opponent carries on it business internationally through its affiliates and or licensees under the name and trademark GALLUP. The Opponent's trademark and name GALLUP forms an essential feature of its corporate name.

That the name GALLUP is a surname of George Gallup (1901-84), an American statistician, who founded the "American Institute of Public Opinion" (the predecessor company of the Opponent) in about 1936 in the United States and who is the "father" of polling and like research. He founded his company in his own name and has registered his own name as a trademark all over the world. The "GALLUP" trademark has been used for more than half a century by the Opponent throughout the world and the mark GALLUP indicates connection exclusively with the Opponent and its affiliates etc. The trademark "GALLUP" has also been advertised extensively in through press media including magazines having world-wide circulation including such International magazines having circulation in Pakistan. In addition the said "GALLUP" trademark of the Opponent has also been widely advertised on the electronic media throughout the world.

3

The Opponent has applied for and/or obtained registration of the trademark "GALLUP" in many countries around the world. In Pakistan the Opponent has a pending application for the trade mark GALLUP under application No. 129970 in class 16.

GALLUP is not only the trademark of the opponent which is registered or pending registration around the world but also forms the essential and the distinguishing feature of the Opponent's corporate name and trading style and that of its authorized affiliates and subsidiaries and as such is exclusively associated with the Opponent and its affiliates and subsidiaries and the Opponent has, in respect of the name GALLUP and in respect of the trademark GALLUP, the exclusive right to the use of the word or marks comprising the essential feature GALLUP.

The Opponent further stated that the Applicant's application No. 124363 for the registration of the trademark GALLUP in respect of "Paper and paper articles, cardboard and cardboard articles; printed matter, programme schedule, newspapers, magazine and periodicals, reports, evaluations, diagrams, charts, print-outs, instructional manuals, survey questionnaires, interview doing charts, compilations, books, book-binding material; photographs; stationery, bags, envelopes, adhesive materials (stationery), artists materials; typewriters and office requisites (other than furniture), printed promotional material as far as falling in this class; instructional and teaching material (other than apparatus); playing cards; printers type and clitches (stereotype)" would be a serious infringement of the rights of the Opponent and use of the mark GALLUP by the Applicant is likely to cause confusion and deception *inter alia* on the following grounds:-

4

The Applicant seeks to misappropriate the word GALLUP which constitutes the trademark and the corporate name of the Opponent, for inclusion in their trading style and name viz. Gallup Business Research Services (Pvt.) Limited under which they have illegally obtained incorporation on March 26, 1993 under the Companies Ordinance, 1984.

That as at the date when the Applicant company was incorporated, that is March 26, 1993, and when the application herein opposed was filed, that is March 20, 1994, a substantial reputation and goodwill had already accrued to the Opponent in Pakistan and elsewhere in respect of its name and trademark "GALLUP" and the products sold thereunder on account of the sales and advertisement aforesaid.

That the mark sought to be registered by the Applicant is phonetically the same and identical with the Opponent's trademark GALLUP as well as an essential feature of the Opponent's corporate name and due to this it is likely to deceive and cause confusion if registered in the name of the Applicant.

The Opponent further contends that:-

(a)    The use of the trademark GALLUP by the Applicant is likely to deceive and cause confusion amongst the trade and consumers. Deception and confusion is specially likely since the goods sought to be covered by application No. 124363 and the goods in respect of which the Opponent's trademark "GALLUP" is used and/or registered world-wide are the same or of the same description and pass through the same trade

5

channels, are available in the same shops and are purchased by the same class of customers.

(b)  That the mark applied for is not registrable and ought not to be registered in the name of the Applicant having regard to the provisions of Section 8(a) of the Trade Marks Act, 1940. The Opponent's "GALLUP" trademark is well-known trademark throughout the world as also in Pakistan and substantial reputation subsists worldwide and in Pakistan in respect of the said trademark on account of the substantial sales and extensive advertisement of products sold under the Opponent's "GALLUP" trademark.



That at the date of filing the application No. 124363 the Applicant was not only fully aware of the worldwide reputation of the Opponent's trademark "GALLUP" but also of its use as the essential and distinguishing feature of the Opponent's corporate name and trading style and of the goodwill arising therefrom not only in Pakistan but throughout the world where the products so identified are extensively used.

(d)  That the use of the trademark "GALLUP" and of the trade name Gallup Business Research Services (Pvt.) Limited by the Applicant would convey, and is likely to convey the false impression that the Applicant is marketing the Opponent's products or is carrying on

6

business with the assistance of and in conformity with the standards and quality prescribed by the Opponent or that the Applicant's products are sold or supplied by a person who is otherwise associated with the Opponent being the proprietor of the trademark "GALLUP" or as the permitted users of the said trademark, this is all the more likely because the Opponent carries on its business under the corporate name and trading style of Gallup, Inc.

(e)    That application No. 124363 seeks registration of the trademark "GALLUP" in respect of goods stated in the application with a view to preventing or impeding the Opponent from carrying on business or from selling goods such as those falling in class 16 or similar such goods in Pakistan under the trademark "GALLUP" and from the normal development and/or planning the normal development of such business.

(f)    That the Applicant has adopted the word "GALLUP" deliberately with the intention to trade on the goodwill and reputation of the Opponent's said trademark and name and to pass-off its goods as the goods of the Opponent or as otherwise associated with the Opponent.

(g)    That the Applicant's claim of proprietorship of the "GALLUP" mark in Pakistan is false having regard to the world-wide registration, use and reputation of the

7

Opponent's "GALLUP" trademark and the Applicant's knowledge in respect thereof.

(h)   That the mark applied for is not adapted to distinguish the goods of the Applicant having regard to prior rights of the Opponent in the said trademark and with regard to the fact that the word "GALLUP" forms the most important and essential part of the Opponent's company name.

(i)   That the proposed registration of the trademark "GALLUP" in the name of the Applicant would be contrary to the provisions of the Trade Marks Act, 1940. Such registration is prohibited by Section 8 of the said Act, and the said trademark does not qualify for registration in the name of the Applicant having regard to Section 6 of the Act. The Applicant is in any case disqualified from applying for the registration of the "GALLUP" mark having regard to Section 14(1) of the Act as the Applicant is not and cannot rightfully claim to be the proprietor of the said mark and any such claims by the Applicant is malafide.

Based on the above contentions the Opponent prayed that the Applicant's application No. 124363 be refused having regard to the fact that applicant adopted the mark "GALLUP" with the motive to gain profit from the goodwill and reputation of the Opponent.

8

In reply to the notice of opposition, the Applicant filed its counter-statement wherein the Applicant has made general denials to all the claims of the Opponent. Furthermore, in the preamble of its counter-statement the Applicant described the history of his adoption of the mark GALLUP and the relevant paragraphs are reproduced hereunder:-

In 1978 Dr. Ijaz Shafi Gilani visited the Gallup International office in London on the advice of **Dr. George Gallup.** Following up on these meetings Dr. Ijaz Shafi Gilani attended the Gallup International annual meeting held in London in 1980. Dr. Gilani made an introduction to his operation in Pakistan and made an application for membership to the Gallup International. The following year in 1981 Dr. Gilani was invited to participate in the Gallup International meeting in Toronto, Canada. He was also asked to present a paper based on his research work in Pakistan. He along with Dr. Jawaid Gilani represented Pakistan at the Conference. Their presentation was greatly appreciated.

Following the Gallup International procedures, Gallup Internationals' secretariat appointed Mr. Norman Webb then Secretary General of Gallup International to visit Pakistan as an inspector on behalf of Gallup to verify the credentials of the local operation in Pakistan, and to judge its suitability to be accepted as a full member within the Gallup International community. Mr. Norman Webb visited Pakistan and inspected the local facilities in Islamabad and Karachi, staying in the country for almost a week. Upon his return he submitted a favourable report and recommended Pakistan's acceptance.

In 1983 Dr. Gilani was invited as an Associate member of Gallup International at its conference held in San Francisco,. California. The meeting was chaired by Dr. George Gallup wherein Mr. Norman

9

Webb presented his report. Despite the favourable tenor of the Report, the meeting decided that the mandatory requirements of two inspectors was not to be relaxed for Pakistan and that the Gallup International ........... only vote on Pakistan's application for membership if acceptance. It would be remembered that Pakistan's attendance at International meetings and the visits of inspector were paid for by the Pakistani delegates themselves (this is true for all countries in the Gallup fold), and there Pakistan had requested that the visit of second inspector might be relaxed to save expenses. Considering the meetings decision, a second inspector Mr. Kenji Ijima of Japan visited Pakistan and inspected the local facilities in both Islamabad and Karachi. It might also be mentioned that public meetings were arranged for both Mr. Webb and Mr. Kenji in Karachi on these occasions, and the press was also invited. There are still a sizeable number of senior business executives in Karachi who attended these public meetings.

In 1984 the Gallup International meeting was held in Dublin, which was chaired by Dr. George Gallup and Pakistan's membership in the Gallup group was mooted alongwith the report of the two inspectors. Dr. Gilani was asked to leave the room at the time of voting. The meeting unanimously voted in favour of Pakistan's admittance to the Gallup fold. Dr. George Gallup the founder and, until his death, the President of the group, personally felicitated Dr. Gilani and said "All comments about your operations in Pakistan were indeed "flattering". Thus from 1984 Pakistan become a full member in the Gallup group and started using the logo Gallup Pakistan (Pakistan Institute of Public Opinion).

10

The Directories include for successive years Gallup organisations USA. The joint appears of Gallup Pakistan and Gallup Organisation in these directories suggests the harmony in this relationship for the period.

M/s. GALLUP INTERNATIONAL upon the request of M/S GALLUP BUSINESS RESEARCH SERVICES (PVT.) LTD. gave a consent letter authorizing them to get registration of the mark in their name.

The Applicant in its Counter-statement prayed for the dismissal of the Opponent's opposition and allowance of its application No. 124863.

Since filing the above pleadings by both the parties hearings were appointed on a number of dates to consider the matter further. It will not be out of place to mention here that the counsel for the Applicant has deliberately delayed the proceedings by not attending the hearings. At most of the hearings the counsel for the Applicant remained absent and ultimately a final hearing date was fixed on 6 April 2006 to give an opportunity to the Applicant's counsel to advance his arguments in support of the Applicant's claims. Both the counsels for the Applicant and the Opponent attended the hearing before me on that date. However, Mr. Taqueer Ahmed Khan, the counsel for the Applicant, stated that he was not prepared to proceed with the case and sought a further adjournment. The counsel for the Opponent objected to the request for adjournment made by the Applicant's counsel. However, in order to dispense fair justice, this tribunal granted time for preparation to Mr. Taqueer Ahmed Khan and the case was adjourned to 12 April 2006.

11

At the hearing fixed on 12 April 2006, both the counsel for the Applicant and Opponent attended the hearing before me and argued the matter at length. Mr. Muhammad Bashir Abbasi argued that the Opponent's mark GALLUP is registered around the world. He drew my attention towards the documentary evidence filed by the Opponent along with the affidavit of Mr. Alec M. Gallup, in support of the opposition. The documentary evidence annexed to the affidavit included a list of worldwide registrations for the GALLUP trademarks, along with a random selection of copies of certificates of such registrations and copies of various publications and articles establishing that the mark "GALLUP" is a well-known trade mark of the Opponent around the world.

Mr. Abbasi further stated that the pleadings of the Applicant itself is contradictory. Elaborating this point r. Abbasi stated that on the one hand the Applicant denied all knowledge that the rights and proprietorship of the trademark GALLUP vests in the Opponent while on the other hand admitted that the Applicant had on the advice of Dr. George Gallup attended the Annual General Meeting of Gallup International held in London in 1980 and that the Applicant had started its business with the permission of the Gallup International therefore proving that the Applicant was from the very beginning fully aware that the Opponent is the proprietor of the GALLUP trademarks.

Mr. Abbasi has further invited my attention toward the evidence filed by the Applicant in support of their application, from where it can be concluded that the Gallup Pakistan was not authorized to capitalize the proprietary right in respect of the trade mark "GALLUP" and any use of the mark GALLUP by the applicant would not entitle them to claim proprietor of the trade mark "GALLUP".

12

In response, Mr. Tauqeer Ahmed Khan argued that the Applicant is proprietor of the mark GALLUP as the Opponent does not carry on any business in Pakistan and the Applicant has been using the trade mark GALLUP for many years in Pakistan.

In view of the above arguments of the learning counsels, this tribunal framed the following issues :-

(a)    Who is the proprietor of the trade mark GALLUP.

(b)    Whether use of the trade mark GALLUP in Pakistan by the Applicant would entitle them to secure registration in its name.

Whether adoption of the mark GALLUP by the Applicant is dishonest/honest.

In response to the issues framed Mr. Abbasi has emphasized that proprietorship of a trade mark is acquired either by virtue of (a) long and extensive use, or (b) registrations. In the instant case the Opponent has secured registrations for the trade mark, GALLUP around the world and has also been carrying on its business over the fifty years and has therefore met both the above mentioned criteria referring to the evidence filed by the Opponent which strengthen the claims of the proprietorship of the Opponent in the trademark GALLUP. He has also argued that the Applicant's adoption of the mark GALLUP is dishonest and that the Applicant had prior knowledge of the proprietary rights of the Opponent's trade mark GALLUP. Mr. Abbasi has relied upon the principle laid down in the case reported in 1956 RPC 1, the relevant passage of the said case is as under:-

13

> *"A proprietary right in a mark sought to be registered can be obtained in a number of ways. The mark can be originated by a person or can be acquired, but in all cases it is necessary that the person putting forward the application should be in possession of some proprietary right which, if questioned, can be substantiated".*

Mr. Abbasi contends that the Applicant in this context has no justification as to why it has attempted to adopt the trade mark of the Opponent being used by the Opponent throughout the world over the last 50 years. Mr. Abbasi has further argued that the use of the mark by any person with fraudulent intention does not vest right to him, and that dishonest adoption can not be protected. In support of his arguments he relied upon the case reported as FSR 1995 at page 515.

It was further argued by the learned counsel for the Opponent that as a general rule, honesty in adoption of a mark is necessary and stated that if the adoption of the trade mark by the Applicant is proved to be dishonest, no amount of user of the mark by him can justify registration. In this regard he has relied upon the principle laid down in the case reported in 1981 SCMR 1039. Another case (PLD 1973 Karachi) 24 has been relied upon by the counsel wherein it has been observed that fraudulent use of mark of one proprietor by another proprietor must be prevented.

The counsel for the Opponent contended that the applicant has made the application for registration of the mark dishonestly and relied upon the ruling laid down in the case reported in PLD 1979 Karachi 83 wherein it has been observed:

> *"that the claim of proprietorship must be made in good faith and the Applicant must be able to justify it if his claim is challenged. If the Applicant know or the circumstances showed that he were aware that another person is the proprietor of the mark, his claim to proprietorship would be false"*

14

Mr. Abbasi has also relied upon another case reported in PLJ 1992 Karachi 410 wherein it has been held that "*if the Applicant were aware of the mark applied for belongs to another foreign proprietor and if it is found that the adoption of the mark is dishonest, registration ought not be granted*".

The learned counsel for the Opponent has argued that the world is a global village in the modern era of the communication. Therefore territorial boundaries is not a bar for the reputation and goodwill of the trade mark in those parts of the world where the proprietor does not have an establishment. The courts in their recent judgments have recognized the concept of "*trans border reputation*" in this regard he quoted the principle laid down in the case reported in PLD 2000 Karachi 139.

Mr. Abbasi has also cited another case on this point namely 1998 CALCUTTA 261 wherein it has been observed that "

"*foreign company choosing name first and using it in several countries excluding India. Indian company entering thereafter in market with same name can be restrained from using the trade mark. The plaintiff with a reputation which is established internationally can sue to protect it in this country even if it does not have any business activity here. In other words reputation of a product may precede its introduction any may exist without trade in such product in the country.*"

Moreover, the learned counsel for the Opponent has cited another case reported in PLD 1991 SC 27 wherein the Hon'ble Supreme Court of Pakistan has ruled that the "*relevant consideration for the registrar of Trade Marks should have been to take the factors as existing on the date the application was filed. Where deception and confusion were the grounds of opposition, honesty of intention in user could not be of any avail*".

15

Moreover, it was argued by the learned counsel for the Opponent that the Applicant was not authorized by the Opponent to obtain any registration in Pakistan of the trademark GALLUP in its name. In any event, throughout the world, Gallup Inc. is the registered proprietor of the trade mark GALLUP and as a general rule it does not authorize any affiliates or subsidiaries to apply for registrations of the trademark GALLUP.

While rebutting the arguments of the Opponent's counsel the Applicant's counsel repeated that Applicant is the proprietor of the mark GALLUP as it has been using the mark in Pakistan and the Opponent is not carrying on its business in Pakistan.  No further arguments or case laws have been cited by the counsel for the Applicant in support of its claims.

I have heard the arguments of both counsels and I have given due consideration to the pleadings and evidence filed by each of the parties. The arguments and evidence submitted by the learned counsel for the Opponent are convincing and in my opinion establish that the proprietorship of the trademark GALLUP vests in the Opponent. Further, the Opponent has proved its case through supporting case laws and the case laws are very relevant to the issues framed by the tribunal. On other hand the pleadings and arguments advanced by the Counsel for the Applicant do not justify its claim of adoption of the trademark GALLUP despite having the knowledge that it is a trademark of the Opponent. Moreover, the evidence led by the Applicant contradicts its claims made by it in the counter-statement that it had no knowledge of the proprietorship of the Opponent in the trademark GALLUP.

16

In view of the above facts and circumstances I have come to the following conclusions:

(a) The adoption of the mark GALLUP by the Applicant is dishonest fraudulent. The Applicant had prior knowledge that rights in the trade mark GALLUP vests exclusive with the Opponent.

(b) The Applicant has no justification to adopt the well known trade mark of the foreign company in its name.

(c) The attempt of securing registration of the mark GALLUP by the Applicant is an attempt to capitalize the opponent's mark GALLUP.



(d) Since the adoption of the trade mark GALLUP by the Applicant is malafide therefore any use of the said mark in Pakistan does not support to the Applicant and such dishonest use can not be protected in the law.

(e) The mark applied for by the Applicant has not been adopted to distinguish its goods within the preview of section 6 of the trade marks Act, 1940.

(f) There is every likelihood of confusion and deception if the Applicant's mark is allowed to proceed to registration.

Before concluding the above opposition I would like to mention here that the Opponent's Application No. 129970 dated 2 May 1995 was published in the Trade Marks Journal No. 635 dated 1 December 2003 at page 881. This Journal was published on 28 January 2004. However, no opposition against this application was filed by the Applicant. As such, the mark should have proceeded to registration, but in order to determine the proprietary right in the trade mark GALLUP my

17

predecessor Registrar has linked this application with the subject opposition proceedings and has not allowed the mark to proceed to registration until the proprietary rights in the said mark are determined.

In view of the above the Applicant is not entitled to any relief and the application No. 124363 is hereby refused. Further the Opponent's application No.129970 is allowed to proceed to registration.

There is no order to as to cost.

The mark order shall take effect after the expiry of appeal period.

sd/ =

(Khalid Hidayat Khan)
Registrar of Trade Marks

**CERTIFIED TO BE TRUE COPY**

1 2 APR 2006

Copy applied for on...
Copy ready on...
Copy issued on...
Compared by...

Examiner of Trade Marks
*Trade Marks Registry*
*Govt: of Pakistan*
*Karachi*

welcome to Gallup Pakistan !



Latest News:

- : ELECTION DAY SURVEY (Part 3)
- : ELECTION DAY SURVEY (Part 2)
- : ELECTION DAY SURVEY (Part 1)

Dr Gilani's Corner:

- Why no protests against Emergency
- If you were to seek my counsel
- History of Electoral Rigging in Pakistan 1970 - 2008
- Reflections on Americanism and Anti-Americanism

Cyberletters:

- : Gallup Cyberletter on Media Research Issue # 43 - 48.

Exhibit
B

Previous Article to attract :

- : Gallup Cyberletter on SME in Pakistan-2004.

more....

ExtraNet | FAQ'S | Affiliations | Site Map | Feedback | |

Search

© 2007 All rights reserved by: Gallup Pakistan.



# Press Release on
# BENAZIR BHUTTO'S ASSASSINATION

The grief on the assassination of Benazir Bhutto was almost universal in Pakistan. As a community, it evoked a different response compared to the demise of Zulfiqar Ali Bhutto and General Zia-ul-Haq when certain segments of the society seemed to breathe a sigh of relief and even rejoice in the tragedy. The grief in the case of Benazir Bhutto has been observed across provincial and linguistic boundaries as well as political and socio-economic divides. It may have been shared with different levels of intensity, but it was grief nevertheless. This expression of unity, which remained elusive during her life and times, was a big gain for Pakistan.

This opinion poll is dedicated to the memory of Benazir Bhutto.

The poll was carried out in two rounds. The First Round was conducted shortly after her assassination, on December 30-31, 2007. The Second Round was carried out during January 6-8, 2008. The sample comprised of over 1300 men and women in all the four provinces spanning cities, large and small towns and villages. Fieldwork was carried out face-to-face. Details on the sample are provided at the end.

The poll addressed the following issues:

1- First Source of Information on the Assassination
2- Public Opinion on 'Who killed Benazir'
3- Public Opinion on Foreign Investigation
4- Public Opinion on the Succession of Leadership in the Pakistan People's Party

**Exhibit C**

**GALLUP**
PAKISTAN
World Leaders in Marketing Research & Consultancy

5-    Public Opinion on the Handling of Crisis by Musharraf and other key
Political Leaders

## FIRST SOURCE OF INFORMATION ON THE ASSASSINATION

For nearly half of the respondents in this survey, their first source of information was Mass Media, principally television (43%) followed by radio (3%). The tragic news reached the other half through relatives and friends, face-to-face (35%) or telephone (17%).

The information reached most people early in the evening, within a couple of hours after the incident (62%); most of the remaining were informed of it later that night (35%). The rest 3% came to know of it on the following morning.

## Public Opinion on
## WHO KILLED BENAZIR BHUTTO?

Nearly half of the sample suspected Government agencies (23%) and Government allied politicians (25%). Al-Qaeda or Taliban were suspected by 17%, while 16% suspected other external forces, principally the United States (12%) and India (4%). 19 % said they would not know.

The view that Government agencies and allied politicians were responsible for the assassination was higher than the national average among voters of Pakistan People's Party (61%).



## Public Opinion on
## FOREIGN INVESTIGATION

A question was asked about views on involving foreign investigators to probe the assassination. In response to the question, **'In your view, would a decision to invite foreign experts to investigate this incident be right or wrong'**, 46% favoured the possible invitation, 30% opposed it, while 24% said they did not know. *(This survey was carried out during December 30-31, 2007, before the decision was made to invite Scotland Yard to assist GOP in the investigation).* One might guess that the favourable view on inviting foreign investigators would have risen later, especially after the formal decision had been made.

## Public Opinion on
## SUCCESSION OF LEADERSHIP IN PAKISTAN PEOPLE'S PARTY

Who should lead the PPP after Benazir Bhutto was a key question. In the First Round of survey *(carried out during December 30-31)*, we provided two options, Asif Zardari or Amin Fahim, but allowed the possibility of nomination of any other person by the respondents to the survey. Between the two pre-structured options, the majority favoured Amin Fahim (48%) followed by Asif Zardari (30%). A number of names other than the two provided in the Question were given by 17% of the respondents, while the remaining 5% did not answer this question.

The Second Round of the survey was carried out after the succession issue had been settled by the party and Benazir Bhutto's son, young Bilawal Bhutto Zardari had been chosen to head the party, with the assistance of his father, Asif Ali Zardari, until the young party head came of age and completed his studies. The question was asked: **'People's Party has chosen Bilawal Bhutto Zardari**

- 3 -



as its head. **Would you say they made the right or the wrong decision?'** Among the respondents to this survey, 53% believed it was the right decision, 28% considered it wrong, while 19% did not answer. The support for the party decision was much higher among PPP voters, 74% of whom endorsed the party choice in favour of Bilawal, while only 14% considered it wrong and 12% did not answer.

In a follow up question, the respondents were asked: **'If you were a member of the People's Party Central Executive Committee, who would you have supported for party leadership: Bilawal Bhutto Zardari, Asif Zardari, Sanam Bhutto or a competent leader from other members of the party?'** In response to this, 47% favoured Bilawal Bhutto Zardari; the remaining were distributed among Sanam Bhutto (21%), Asif Zardari (6%) and one of the other competent party member 19%; 7% provided other alternatives to the issue. Among the PPP voters, views were slightly different than the national average. Among them the responses were: Bilawal Bhutto Zardari (64%), Sanam Bhutto (21%), Asif Zardari (5%), other competent party leader (5%), while the remaining 5% did not respond. These were the findings of the Second Round of survey carried out mostly during January 6-8, 2008.

**Public Opinion on**
**HANDLING OF THE CRISIS BY POLITICAL LEADERS**

The positive role of Nawaz Sharif on the occasion of the assassination was given the highest rating by the respondents of this survey. In response to a question: **'How would you consider the role of political leaders in handling the crisis of Benazir Bhutto's Assassination: Good, Acceptable or Poor?'** the following ratings emerged, showing the percentage of respondents giving Good, Acceptable or Poor rating.

**GALLUP**

PAKISTAN

"How would you consider the role of political leaders in
handling the crisis of Benazir Bhutto's Assassination?"



| | Good | Acceptable | Poor | No Response |
|---|---|---|---|---|
| Pervez Musharraf | 24% | 32% | 34% | 9% |
| Nawaz Sharif | 62% | 30% | 2% | 5% |
| Chaudhry Shujaat | 15% | 33% | 38% | 14% |
| Altaf Hussain | 21% | 48% | 15% | 16% |
| Qazi Hussain Ahmad | 28% | 43% | 12% | 17% |

Source: Gallup Pakistan, 2008



# Sample Composition

## Total  ≈  1300

BREAKDOWN

*Province-wise*

| | | |
|---|---|---|
| Punjab | n ≈ 725 | (54%) |
| Sindh | n ≈ 350 | (26%) |
| NWFP | n ≈ 175 | (13%) |
| Balochistan | n ≈ 100 | (7%) |

*Location-wise*

| | | |
|---|---|---|
| Large Cities (over 2 million) | n ≈ 300 | (23%) |
| Medium Cities (over half a million) | n ≈ 350 | (27%) |
| Towns (Population 5000 plus) | n ≈ 400 | (31%) |
| Villages | n ≈ 250 | (19%) |

*Gender-wise*

| | | |
|---|---|---|
| Men | n ≈ 775 | (57%) |
| Women | n ≈ 575 | (43%) |

# Gallup Pakistan
## Latest Press Release

## PUBLIC PULSE ON

## ELECTIONS AND OTHER RAGING ISSUES

11 February, 2008



**World Leaders in Marketing Research & Consultancy**

H-45, St. 52, F-7/4, Islamabad, Pakistan. Tel (+92-51) 2825745; Fax: (+92-51) 2827417
Email: isb@gallup.com.pk; Web: www.gallup.com.pk

**Exhibit D**



## PUBLIC PULSE ON
## ELECTIONS AND OTHER RAGING ISSUES

The year 2008 is marked by reverberations from the past. While circumstances surrounding the assassination of PPP Chairperson, Ms. Benazir Bhutto, remain largely unsolved, there is continuing uncertainty about the February General Elections, despite repeated assurances to the contrary by the President of Pakistan, General (Rtd.) Pervez Musharraf. A severe atta (wheat) crisis has gripped the country leading the interim Government to issue "Rashan" (grocery) cards, even as the source of the wheat crisis remains ambiguous.

In the midst of all this, PML (N) leader Nawaz Sharif's four proposals to give credence to the electoral process have not come as a surprise to the general public. In a press conference on January 16, 2008 he asked for President Musharraf to resign, the formation of a new Caretaker Government of National Consensus in consultation with all Political Parties, reconstitution of the Election Commission headed by Justice Rana Bhagwandas, and calling of fresh General Elections under a new poll schedule.

Gallup Pakistan asked more than 1300 men and women in all the four provinces of the country spanning cities, large and small towns and villages what they think about these emerging socio-political issues and found some revealing results. In the most recent nationwide polls carried out on January 19-20, 2008 and a week later on January 26-27, 2008, the fieldwork was carried out face-to-face and the error margin is estimated to be in the range of $\pm$ 3-5% at 95% confidence level. Details on the sample are provided at the end.

**Note**: *In figures not adding up to 100 %, the remaining are those who did not respond, unless otherwise mentioned.*

The polls addressed the following issues:

1. Public perceptions on exhuming Ms. Benazir Bhutto's body
2. Public perceptions on Mr. Nawaz Sharif's new set of proposals.
3. Public perceptions on Elections scheduled for February 18, 2008
4. Public perceptions on the Atta (Wheat) Crisis
5. Controversy around the person of President General Pervez Musharraf



## Public Perceptions on Exhuming Ms. Benazir Bhutto's Body

Various investigation teams as well as the State have sited a number of reasons as the possible causes behind the tragic death of Benazir Bhutto on December 27, 2008 in Rawalpindi. While the PPP asserts that its Chairperson was shot dead, state investigation teams claim that it was a fatal blow to the head that caused her demise. Mr. Asif Zardari, Benazir Bhutto's husband and the Co-Chairperson of PPP, ruled out the possibility of an exhumation. When respondents were asked, "In your view, should Benazir Bhutto's body be exhumed for a postmortem" more than two-thirds of the respondents (69%) opposed any such measure, while only 29 % favored it. 2 % did not answer.

## Confused Support for the Nawaz Formula on the Elections

National respondents were asked to give their opinion on whether they agree, mildly agree or disagree with each individual proposal put forward in the Nawaz formula. The results were as follows.



**Source:** Surveys Gallup Pakistan, January 19-20, 2008

When asked, "Do you agree or disagree that General Pervez Musharraf should resign?" a clear majority of 81% said they agree *(66% strongly agree, 15% mildly agree)*, while only 13% disagree. Support for this proposal was higher in the rural areas where 73% strongly agree, 15% mildly agree and only 9% did not agree.



Similar support appeared for the proposal to make the Chairman of Senate, the new interim President. However, it was not as unequivocally strong as in the case of Musharraf's resignation. While 35% said they strongly agree that Chairman of Senate should become the interim President, a slightly higher number, 38%, mildly agree. 13% did not agree at all. 15% of the respondents did not answer this question.

On the proposal to reconstitute the Election Commission, when respondents were asked, "Do you agree or disagree with the view that Justice Rana Bhagwandas should be made the new Election Commissioner", 78% said they agree *(43% strongly, 25% mildly)*. 17% did not agree and 15% did not answer. Support for this view was lower in urban areas where only 53% of the respondents agree *(30% strongly, 23% mildly)* while 21% disagree and the rest did not answer.

The proposal to form of a new Caretaker Government based on a National Consensus also received high public support. While 36% agree strongly with the view that "the present Caretaker Government should be replaced by a new one in which PPP, PML (N), PML (Q); MMA and MQM, in other words all major political parties are represented", 32% agree mildly. 17% disagree.

The most interesting results were seen in response to the final proposal – calling fresh elections. When national respondents were asked, "Do you agree or disagree with the view that the new caretaker government should hold General Elections that are truly free sometime later this year instead of in February", close to one third of the respondents did not agree (28%). Support for this proposal rested at 28% strongly and 29% mildly agree. But the greatest opposition to this proposal came from supporters of PML-Q (37%) and surprisingly PML-N (35%).

**CONFUSION ABOUT THE DESIRABILITY OF ELECTIONS OF FEBRUARY 18**



February Elections will be fruitful — 67%

Elections should be postponed — 57%

**Source:** Surveys Gallup Pakistan, January 2008



Despite the convincing support to the Nawaz formula, polling data shows that the support is rather self-contradictory and confused in some ways. Thus, when asked, "In your view, would the forthcoming elections produce a fruitful political outcome" 67% answer 'yes', 13% say no and only 6% say the elections will further add to the political crisis. Thus a majority of the voters on the one hand support the Nawaz formula, which in effect devalues the ability of the forthcoming election in solving the current political crisis, and on the other hand expect a positive outcome from the February elections.

This confusion might reflect the ambiguity in the actions of political leadership itself. Thus Nawaz presents his formula, which devalues the elections yet actively participates in it and insists that PML-N will contest the elections.

In a way the voter here mirrors the political stance of the leadership. In both cases the bottom line is **Confusion on the political value of the Elections on February 18.** This confusion explains the apparent lack of interest in the election campaign.

## Public Perceptions on the Atta (Wheat) Crisis

While political uncertainty prevails, during the past one month Atta (wheat) crisis had gripped the country but the exact nature of the crisis is not centered on the unavailability of this stable food item but its availability at exceedingly high prices. For 46% of the national respondents the most significant problem facing them while purchasing wheat was the availability of expensive wheat. For 20% of the respondents it was unavailability of the food item; 11% were most troubled by standing in queues while only 22% did not face any difficulties.

Addressing some of the concerns of the citizens, the Caretaker Prime Minister recently initiated a "Rashan Card Program". Almost 80% of the respondents had heard or read about the new scheme (54%; 25%); 21% say they did not know about it. When whether this new scheme was a good or a bad method, only 37% of the respondents answered in an affirmative, for 41% it was a bad method, while 23% did not answer.

Although the wheat crisis has led to a shuffling of blame within the ranks of the previous government, public opinion on who is responsible for this crisis finds fault with wheat traders as well as the government. Respondents were asked, "Who in your opinion, is most responsible for the wheat crisis?" 44% believe President Musharraf is to blame, followed by 29% who think 'Wheat Traders' are responsible. While 14% blame the former Prime Minister Shaukat Aziz,



Former State Minister Pervaiz Elahi is considered responsible by 8% of the respondents. 4% gave various other options.

## Controversy Around The Person Of President General Pervez Musharraf

While President Musharraf's claims to be necessary for the safety of the country from terrorist forces, he seems unsuccessful in the ability to project this image to the public. Respondents were asked, "In your opinion, will controlling acts of terrorism become easier or more difficult if Musharraf resigned". More than half of the respondents (56 %) believed that it would actually become easier while 25% said it would not have any effect. Only 17% of the respondents believed that Musharraf's resignation would make it more difficult to control acts of terrorism in the country. 2 % did not respond.



OPINION POLLS:
One week ahead of Election

## Sample Composition

### Total $\simeq$ 1300

BREAKDOWN

### Province-wise

| | | | |
|---|---|---|---|
| Punjab | n $\simeq$ | 725 | *(54%)* |
| Sindh | n $\simeq$ | 350 | *(26%)* |
| NWFP | n $\simeq$ | 175 | *(13%)* |
| Balochistan | n $\simeq$ | 100 | *(7%)* |

### Location-wise

| | | | |
|---|---|---|---|
| Large Cities (over 2 million) | n $\simeq$ | 300 | *(23%)* |
| Medium Cities (over half a million) | n $\simeq$ | 350 | *(27%)* |
| Towns (Population 5000 plus) | n $\simeq$ | 400 | *(31%)* |
| Villages | n $\simeq$ | 250 | *(19%)* |

**Weighting:**
The achieved sampled is re-weighted to correspond with the census distribution of provincial and urban rural segments of Pakistani Population.

**Note:** There is a slight variation in the achieved number of respondents from survey to survey. The approximate breakdown (generally within 2-3% variation) is given above

## Sampling Methodology

The finding are based on a national sample comprising a cross-section of Pakistani men and women age 18+, belonging to all provinces of Pakistan, its large and medium cities, towns and villages according to the approximate sizes noted above. The achieved sample is re-weighted to correspond with the census distribution of provincial and urban rural segments of Pakistani population. The sample was selected through multi-stage area probability sampling. The error margin for a sample of this type would be approximately $\pm$3-5% at 95% confidence level. Fieldwork was carried out face to face during on January 19-20, 2008 and January 26-27, 2008.

# Gallup Pakistan
## Latest Press Release

## PUBLIC PULSE ON

## ELECTIONS AND OTHER RAGING ISSUES

## PART II

**Survey Dates:**       *February 9-10, 2008*

**Results released on:**  *February 15, 2008*



**GALLUP**
PAKISTAN
Affiliated with Gallup International
World Leaders in Marketing Research & Consultancy

H-45, St. 52, F-7/4, Islamabad, Pakistan. Tel (+92-51) 2825745; Fax: (+92-51) 2827417
Email: isb@gallup.com.pk; Web: www.gallup.com.pk

Exhibit
E



## Perceptions About TURN OUT
## And voting on the Election Day

When asked, "Given the present circumstances, in your opinion will the elections be free and fair?" a majority of 51% still doubts the forthcoming elections on February 18 will be free and fair. But the level of trust has increased from 15% in early November, 2007 to 31% in the latest Gallup Pakistan poll conducted on January 26, 2008. There are good reasons behind the change including the lifting of Emergency, shedding of Army Chief uniform by Pervez Musharraf, partial restoration of media freedom, return of exiled leaders, visible presence of national and international election observers. But many problems continue to persist including the subservience of judiciary, partisanship of local governments and other state functionaries as well as the nagging memories of rightly or wrongly held notions that rulers would go to any length to hang on the authority and would twist and bend the elections rather than accept electoral defeat. It is nevertheless gratifying for researchers that the science of polling provides sensitive instruments to pickup changes in perceptions, and that the ordinary citizen of Pakistan is sufficiently objective in changing his and her perceptions when realities change.

Opinion Polls conducted only weeks before Election continue to produce nuanced perceptions on the coming event. In the recent Gallup Pakistan nation-wide polls, the second of a two-part series, perception, intentions and inclinations to vote in the forthcoming Elections were questioned. More than 1300 men and women in all the four provinces of the country spanning cities, large and small towns and villages were questioned on February 9-10, 2008. The fieldwork was carried out face-to-face and the error margin is estimated to be in the range of $\pm$ 3-5% at 95% confidence level. Details on the sample composition and methodology are provided at the end.

**Note**: *In figures not adding up to 100%, the remaining are those, which did not respond, unless otherwise mentioned.*

The polls addressed the following issues:

1. Voting Intention in the forthcoming Elections.
2. Voter Turnout on Polling Day
3. Public Perceptions on the Process of Civilianization
4. Public Perceptions on American Influence



## WHO STANDS WHERE A WEEK BEFORE THE ELECTIONS

According to the survey a week prior to the election, it appears to be a strong contest between PPP and PML-N with PML-Q trailing behind the two. PPP does considerably better than PML-N in Sindh, Balochistan and to some extent in NWFP. But it is notably behind PML-N in the Punjab province. Since Punjab is the largest province *(nearly 55% of seats in the parliament)* this creates an interesting situation. While PPP is likely to score more votes nationally it may be neck and neck with PML-N in the seats in the parliament or even behind PML-N if the PML-N edge in Punjab becomes more decisive in the final week of the election. From the analysis of election campaigns of last five elections we know that the final week can be quite decisive. The end week does not make people switch voting loyalties yet it is decisive by way of success or failure of parties in mobilizing their own vote banks. In recent years both major parties had disgruntled and unhappy supporters. Would they rally back to the mother party in the last week of the campaign could be decisive. Another uncertainty to the very last day is the question of fear of violence on the Election Day. It seems to be deterring more voters in Punjab, the urban areas and women. Both PML-N and PML-Q are likely to be affected by low turn-out slightly more than PPP.

At an ALL PAKISTAN level and with various uncertainties still to play out, our barometer reading on party positions a week ahead of elections were PPP 35%, PML-N 25%, PML-Q 15%, while 15% support smaller parties and 10% remain undecided.

Looking at the PROVINCES, PML-N has a notable edge over PPP in PUNJAB standing at 38% against 28% for PPP and 22% for PML-Q. This edge of PML-N which could still move in either direction, will determine the outcome of the election.

The position in other provinces follows more traditional patterns with MQM dominating URBAN SINDH and PPP RURAL SINDH. In NWFP the vote is split between JUI/MMA, ANP, PPP and the two Muslim Leagues, as well as independent candidates. The survey indicates that both ANP and PPP are likely to perform better than in the previous elections; yet the outcome will be a split of seats among all four. BALOCHISTAN continues to be fragmented among various national and regional parties.



OPINION POLLS:
One week ahead of Election

## INTENTION TO VOTE (TURN-OUT):

When respondents were asked, "Given the circumstances, what are the chances that you will cast a vote in the Elections?" a majority says there are high (52%) or fair/moderate (37%) chances. Only 9 % say they will not cast a vote.

However, intentions to vote differed between men and women. While 57% of the male respondents say there are high chances that they will vote in the coming elections, the figure is only 29% among the female respondents. 21% of the women interviewed say they do not intend to vote at all.

Intention to vote was considerable higher in rural with 95% of the respondents saying there are high (62%) or fair (33%) chances they will vote, while respondents in urban areas were less inclined to vote. A considerably lower 78% say there are high (33%) or moderate (45%) chances of voting. 22% in urban areas say they will not cast a vote compared to only 5% in rural areas.

**WHAT IS THE PROBABILITY THAT YOU WILL VOTE IN THE FORTHCOMING ELECTIONS?**



**Source**: Gallup Pakistan, Surveys February 9-10, 2008

Among supporters of major political parties, the intention to vote also reflected interesting results. While more than 90% of the supporters of the three major political parties, PPP, PML-N, and PML-Q, are intending to cast their vote, there is a stronger resolution among PPP supporters, 64% of who say there are high chances they will vote in the coming elections, compared to 48% of PML-N and 50% of PML-Q.



OPINION POLLS:
One week ahead of Election

### CHANCES OF VOTING AMONG SUPPORTERS
### OF MAJOR POLITICAL PARTIES



**Source:** Gallup Pakistan, Surveys February 9-10, 2008

Comparative data from previous elections shows that intention to vote has been considerably higher than the actual turnout rates. People are optimistic about their chances of voting but fairly few turn out on the polling day.

*In previous election only about one half of those who showed intention to vote actually turned-out to vote. Given that background we can expect a low turn-out in the range of 30%.*

### INTENTION TO VOTE VS ACTUAL VOTE
(1988-2002)



**Sources:** Gallup Pakistan, Surveys 1988-2002 *(Intention to Vote)*
Election Commission of Pakistan, 1988-2002 *(Turn-out Rates)*

GALLUP
PAKISTAN
Affiliated with Gallup International
World Leaders in Marketing Research & Consultancy

OPINION POLLS:
One week ahead of Election

## EXPECTED VIOLENCE ON ELECTION DAY

Despite high intentions to vote, people fear that the elections day will be marked by violence. When national respondents were asked "In your view, is there a danger of riots and violence on Election Day" more than half say yes there is a lot (19%) or some (35%) danger of violence. 42% feel there is no danger at all. 4% did not answer this question.

**"IN YOUR VIEW, IS THERE ANY DANGER OF RIOTS AND VIOLENCE ON ELECTION DAY?"**



**Source:** Gallup Pakistan, Surveys February 9-10, 2008

Once again responses varied differently among women and men. While half (50%) the male respondents feel there was a lot (19%) or some (31%) danger of violence, among women the figure is as high as 79% expecting a lot (21%) or some (58%) danger of violence on Election Day. Only 21% female respondents feel there is no danger at all compared to more than twice as many among men (47%).

Similarly, expectation of violence on Election Day is lower among rural respondents than their urban counterparts. While only 43% expect a lot of some level of violence in rural areas (17%; 26%); in urban areas the figure is as high as 77% of the respondents expecting a lot or some level of violence (23%; 54%). Those expecting no violence at all are 53% in rural areas and only 21% in urban areas.

It would seem that the lower chances of voting among women and urban residents have some foundation in the high expectation of violence and rioting among these groups.



## SUPPORT FOR CIVILIANIZATION

Recently, the new Chief of Army Staff, General Kiyani issued an order for army personnel serving in civilian institutions to return to the barracks. The general public has appreciated this move towards 'civilianization'. When asked, "In your opinion, is the decision to call back army officers from civilian institutions the right decision", a clear majority of 67% say yes. Only 16% disagree while 16% say they did not know. Support for this decision is higher among urban areas where 72% say yes, 16% say no, and 11% don't know. In urban centers support rests at 67%, 17% disagree and 26% have not formed an opinion.

**"IN YOUR OPINION, IS THE DECISION TO CALL BACK ARMY OFFICERS FROM CIVILIAN INSTITUTIONS THE RIGHT DECISION"**



Source: Gallup Pakistan, Surveys February 9-10, 2008

## AMERICAN INTERFERENCE IN NATIONAL POLITICS

When national respondents were asked, "In your view is America playing a good or bad role with reference to its remarks about Pakistan's elections" 61% say bad, while only 19% say good. 18% say they did not know.

In response to another question, "In your view, is American support for Musharraf as the President good or bad for Pakistan?" 59% of the respondents say it is bad for Pakistan, while 29% say it is good. 16% say they do not know.

When asked, "Do you think Musharraf can remain the President of Pakistan if he does not have American support" 56% say no, 31% say yes while 13% say they do not know.

**GALLUP** PAKISTAN
Affiliated with Gallup International
World Leaders in Marketing Research & Consultancy

OPINION POLLS:
One week ahead of Election

# SAMPLE COMPOSITION

## Total  ≃  1300

BREAKDOWN

### Province-wise

| | | | |
|---|---|---|---|
| Punjab | n ≃ | 725 | *(54%)* |
| Sindh | n ≃ | 350 | *(26%)* |
| NWFP | n ≃ | 175 | *(13%)* |
| Balochistan | n ≃ | 100 | *(7%)* |

### Location-wise

| | | | |
|---|---|---|---|
| Large Cities (over 2 million) | n ≃ | 300 | *(23%)* |
| Medium Cities (over half a million) | n ≃ | 350 | *(27%)* |
| Towns (Population 5000 plus) | n ≃ | 400 | *(31%)* |
| Villages | n ≃ | 250 | *(19%)* |

**Weighting:**
The achieved sampled is re-weighted to correspond with the census distribution of provincial and urban rural segments of Pakistani Population.

**Note:** There is a slight variation in the achieved number of respondents from survey to survey. The approximate breakdown (generally within 2-3% variation) is given above

### Sampling Methodology

The finding are based on a national sample comprising a cross-section of Pakistani men and women age 18+, belonging to all provinces of Pakistan, its large and medium cities, towns and villages according to the approximate sizes noted above. The achieved sample is re-weighted to correspond with the census distribution of provincial and urban rural segments of Pakistani population. The sample was selected through multi-stage area probability sampling. The error margin for a sample of this type would be approximately $\pm$3-5% at 95% confidence level. Fieldwork was carried out face to face during on February 9-10, 2008.

# Election 2008: Gallup Survey

## ELECTION DAY SURVEY

Gallup Pakistan carried out a large scale Election Day Survey on February 18 across all four provinces of Pakistan. The survey was not meant to be an early prediction nor to monitor the fairness of elections. It was a survey to determine the age, income and education composition of the vote banks of the leading political parties. But it also captured perceptions about fairness of elections, voter's outlook on the powers of the prime minister and a host of other issues.

The Daily Business Recorder and Aaj TV have the unique honour of working with Gallup Pakistan and PILDAT to carry out this study.

The study findings will be published in several parts. The first and introductory part is being published today.

The introductory part looks at the profile of party vote banks and perceptions of voters about fairness of the electoral process on the election day.

The findings are based on a survey of 5338 statistically selected voters from all the four provinces of Pakistan. They were randomly selected as they stepped out of polling stations. Detailed methodology available on request.

**Exhibit F**

# PROFILE OF POLITICAL PARTY VOTE BANKS

*By Age, Gender, Education, Income Group and previous voting history.*

## AGE COMPOSITION

The vote bank of all three leading parties are fairly similar in age composition.

| | PPP | PML(N) | PML(Q) |
|---|---|---|---|
| | *Percent share* | | |
| New voters (Age 18-2 1) | 6% | 6% | 6% |
| Age 22-49 | 73% | 74% | 72% |
| Age 50+ | 21% | 20% | 22% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

# EDUCATIONAL COMPOSITION

PML(N) vote bank has a higher share of college educated voters compared to the other. The PPP vote bank has a notably higher share of illiterate voters.

| | PPP | PML(N) | PML (Q) |
|---|---|---|---|
| | *Percent share* | | |
| Illiterate | 43% | 26% | 27% |
| Upto Middle School | 29% | 29% | 34% |
| High School and Intermediate | 23% | 34% | 44% |
| Bachelors and Masters (College) | 5% | 11% | 5% |





*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

## INCOME POSITION

PML(N) vote bank has a higher share of upper income groups followed by PML(Q). PPP has higher share of the very poor.

| | PPP | PML(N) | PML(Q) |
|---|---|---|---|
| | Percent share | | |
| Very Poor* | 12% | 8% | 8% |
| Lower Middle | 65% | 57% | 60% |
| Middle and Higher | 23% | 35% | 32% |

*Income Group Definitions available on request



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

## GENDER COMPOSITION

PML (Q) and PPP vote banks have higher share of women compared to PML (N).

| | PPP | PML(N) | PML(Q) |
|---|---|---|---|
| | Percent share | | |
| Men | 47% | 50% | 44% |
| Women | 53% | 50% | 56% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

# PERCEPTIONS ABOUT FAIRNESS ON THE POLLING DAY

The majority of a scientific sample of voters from all across the country perceived that the polling process on the election day was fair. However views on environment prior to polling were mixed.

72 % perceived there was very little chance of unfair practice on their polling stations, while 28% believed such a chance existed.

This preliminary report provides questions by answers to the relevant survey questions. It is followed by a summary table on the indicators of perceptions about fairness on election day and the electoral environment.

## *Overall*

**Question:** Do you suspect Election Day rigging against the party/candidate you voted today for the national assembly seat at your polling station?

*Percentage of respondents*

| | |
|---|---|
| Yes | 28% |
| No | 72% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

### *Polling station Level*

**Question :** Do you think that the polling staff at the polling station is impartial in your constituency or partial towards a particular candidate?

*Percentage of respondents*

| Partial | 7% |
|---|---|
| Impartial | 80% |
| Don't Know | 13% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

**Question 12:** Did you have your hand stamped after you cast your ballot?

*Percentage of respondents*

| Yes | 96% |
|---|---|
| No | 3% |
| No Response | 1% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

### *Pre-Election Environment*

**Question**: Do you think that the local administration is impartial in your constituency or is partial towards a particular candidate?

| *Percentage of respondents* | |
|---|---|
| Partial | 20% |
| Impartial | 68% |
| Don't Know | 12% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

**Question:** Some people believe that the Caretaker Government is partial in the elections while some others believe that Government is impartial. What do you think?

| *Percentage of respondents* | |
|---|---|
| Partial | 36% |
| Impartial | 51% |
| Don't Know | 13% |



*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

**Summary Tables**

## Perception on fairness on Election Day and Electoral Environment

|  | Overall | Polling Staff | Procedure Observance | Local Government | Caretaker Government |
|---|---|---|---|---|---|
| Fair | 72% | 79% | 95% | 68% | 55% |
| Unfair | 28% | 9% | 4% | 20% | 32% |
| No Response | 0 | 12% | 1 % | 12% | 13% |

*Source*: Gallup Pakistan Exit Poll Survey, February 18, 2008

**MORE TO COME…………..**

Other Interesting Issues to be probed in subsequent parts include:

**Powers of the Prime Minister:**

*Who do the voters want to be more powerful, Prime Minister or the President; and who did they expect to be more powerful.*

**Second Best Choice:**

*Which other party is closest to the voter? The voters were asked: who would have been your second best choice for voting today?*

**Switching from other parties:**

*Did the voters switch political loyalties during this election?* The study determines the share of switchers in leading party vote banks.

These and many other issues will be analyzed by Gallup Pakistan in the forthcoming parts especially for Daily Business Recorder and Aaj TV.

**Gallup Pakistan – Business Recorder**

# EXIT POLL SURVEY

Gallup Pakistan carried out a large scale Exit Poll Survey on February 18 across all four provinces of Pakistan, exclusively for the Daily Business Recorder and Aaj TV Network. The findings of this unique survey are being published in several parts in the Daily Business Recorder as well as broadcasted by Aaj TV. The first part was published on February 20. Today we are releasing the second part.

## VIEWS OF VOTERS ON POWERS OF
## PRIME MINISTER AND THE PRESIDENT

The distribution of power between the President and the Prime Minister has been a troublesome issue in Pakistan's recent political history. In some cases, it led to the dissolution of the parliament while in others it created a situation where the Parliament, in the view of many, ceased to perform its Constitutional function. Given that background the voters who voted in the 2008 elections for the Parliament in Pakistan were asked to give their understanding of who should have more powers to run the country: the President or the Prime Minister. They were also asked to state their expectations of what might happen in practice. They were asked *(irrespective of what their own preference was)* who would exercise more powers, once the new parliament is elected: the President or the Prime Minister.

Exhibit
G

Seventy-eight percent (78%) of the national sample of voters interviewed in all the four provinces *(Total sample was 5538 voters interviewed on February 18, as they stepped out of the polling stations)* said they would prefer that the new Prime Minister should exercise more powers than the President. However, when asked to give their perceptions of what might actually happen, their views were quite different. Forty percent (40%) believed that in reality the President will exercise more powers. The survey found a sharp difference between the preferences of voters and their expectations about the realization of their preferences.

The survey showed a high degree of clarity among the cross-section of men and women voters of all ages, educational and income status on who should exercise more powers as 78% support more powers to the Prime Minister. However the survey findings also reflect a high degree of skepticism on the practice since only 60 % believe that the new elected Prime Minister will actually have more powers in running the country.

Part 3 of the series of Reports based on the Gallup Pakistan-Business Recorder/Aaj TV Exit Poll *(Election Day Survey)* will appear tomorrow. It will take up the issue of whether the voters of various parties *(which are trying to put together an alliance)* are emotionally close to or distant from each other. The voters were asked: who would be your second choice. Tomorrow we shall focus on the answers to this question given by the voters of PPP and PML(N) among others.

# CLARITY ON PREFERENCE

Who should have more powers to run the country: President or Prime Minister?

| President | 22% |
|---|---|
| Prime Minister | 78% |



# SKEPTICISM ON PRACTICE

Who will have more powers to run the country?

| President | 40% |
|---|---|
| Prime Minister | 60% |



# Election 2008: Gallup Survey

*Report Number 3*

## Gallup Pakistan – Business Recorder

## EXIT POLL – ELECTION DAY SURVEY

As Asif Ali Zardari and Nawaz Sharif scramble to put together an alliance to form a Government one thing must be on their mind: How would their voters react to their alliance-formation. Are they emotionally supportive of some political parties more than others? Are they pre-disposed to some alliances more than others?

Anticipating this situation the Gallup Pakistan – Business Recorder Exit Poll Survey had asked a nationally representative sample of voters on the Election Day: **"You have just voted for a person of your choice. Please let us know who would have been your second best choice?"**

The responses by the voters of all the leading parties were both interesting and revealing. A sizeable group, although a minority, in each party refused to give a second choice. They were firmly attached to the party of their first choice and would not speculate on any other possibility. For want of a better description we have termed them as the "Rigid Voters". Yet a majority in each party's voters mentioned a second choice. These choices would be a good tip for party leaders about the preferences of the voters who voted them in as parliament members. Here are the findings:

Exhibit
H

## THE RIGID VOTERS

The proportion of rigid voters who would not even speculate on a second best choice varies from party to party. Interestingly it was the lowest in the PML(N) vote bank, 25 % and the highest in the PML(Q), 55 %.

Fig.1

**Rigid Voter Ratio in Various Political Parties**



# PREFERRED ALLIES

**PPP-PML(N) Alliance:** Voter Affinities

The Exit Poll-Election Day Survey reveals that at this point the voters of the two top parties, PPP and PML(N) have the highest level of mutual political affinity. Thus, 40 % of **PPP voters** indicated PML(N) as their second best choice; and 45 % of **PML (N) voters** said the same about PPP.

**PPP-PML(Q) Alliance:** Voter Affinities

On the other hand only 14 % of **PPP voters** indicated PML(Q) as their second best choice and 13 % of **PML-Q voters** would choose PPP as their second best choice.

**PPP-MQM Alliance:** Voter Affinities

The survey showed very uneven relationship between PPP and MQM voters. Among MQM voters 36 % would have PPP as their second choice. In contrast only 1 % of PPP voters chose MQM as their second choice. Since the two parties might need to ally in the Provincial Assembly of Sindh, the party leaders would need to motivate their voters in favor of cooperation.

**PML(Q)-MQM Alliance:** Voter Affinities

The affinity between **PML(Q) voters and MQM voters** is also rather low. Only 12 % of MQM voters indicated PML(Q) as their second best; the comparable figure among PML(Q) voters for MQM was 9 %.

**ANP Alliance with PPP and PML(N):** Voter Affinities

ANP voters are divided roughly equally between PPP and PML(N) as their second best choice. 17 % ANP voters indicated PPP and 18 % ANP voters indicated PML-N as their second best choice.

### Table 1

Question: You have just voted for a person of your choice. Please let us know who would have been your second best choice?

**Second Best Choice**

| Among voters of | PREFERENCES OF ALLIANCE MINDED VOTERS | | | | | | RIGID VOTERS | NR |
|---|---|---|---|---|---|---|---|---|
| | PPP | PML-N | PML-Q | MQM | ANP | Others | | |
| **PPP** | | 40% | 14% | 1% | 2% | 8% | 35 % | 0% |
| **PML-N** | 45% | | 20% | 1% | 2% | 7% | 25 % | 1% |
| **PML-Q** | 13% | 17% | | 9% | 0% | 5% | 55 % | 1% |
| **MQM** | 36% | 4% | 12% | | 0% | 3% | 46 % | 0% |
| **ANP** | 17% | 18% | 4% | 1% | | 20% | 40 % | 1% |

The Survey was carried out by Gallup Pakistan in collaboration with PILDAT. It was done exclusively for Business Recorder and Aaj TV Network.

# REFLECTIONS ON
# AMERICANISM AND ANTI-AMERICANISM

**Ijaz Shafi Gilani**
**Professor of International Relations**
**International Islamic University Islamabad**

**Paper presented at the**
**International Studies Association**
**Annual Convention Hilton, Chicago**
**February 28 - March 3, 2007**



**GALLUP**
P A K I S T A N
Affiliated with Gallup International
World Leaders in Marketing Research & Consultancy

H-45, St. 52, F-7/4, Islamabad, Pakistan. Tel (+92-51) 2825745; Fax: (+92-51) 2827417
Email: isb@gallup.com.pk; Web: www.gallup.com.pk

Exhibit
I

# REFLECTION ON
## AMERICANISM AND ANTI-AMERICANISM

As suggested I shall peg my comments on issues raised in the excellent book by Katzenstein and Keohane[1] and also address the subject of Anti-Americanism more generally. My comments will draw upon public opinion surveys which I have done in Pakistan over the last 25 years as well as cross –national surveys done by me and colleagues at Gallup International in over 60 countries across the globe.

Walter Lippmann was a great American columnist of his time in the first half of the last century, and was widely known as a profile writer on public opinion. He added a small 's' to the word 'public' and introduced the notion of **Public(s)** as opposed to a mass of one public, whose opinions were to be discussed. This suffix of little 's' opened up new grounds in the fields of opinion and marketing research, described as 'segmentation analysis', which continues to prosper to this day. Adding the word 's' to 'anti-Americanism' is a significant addition by Katzenstein and Keohane in the same way because it helps to make a distinction between various forms of 'anti-Americanism'. Katzenstein and Keohane introduce another refinement in the various expressions of opposition to America. They distinguish between **Opinion** (a difference of opinion with the prevailing US government policy); **Distrust** (in America as a country) and **Bias**, as a result of which difference between good and bad policies, as well as between various

---

[1] Keohane, Robert and Peter Katzestein 2006 <u>Anti- Americanisms in World Politics</u> Ithaca: Cornell University Press.

dimensions of behaviour and various constituents of American society begin to disappear and all of them are seen in negative terms.

Furthermore, the authors make a distinction between **various motivations for discontent.** They see these emerging from three different fountain-heads, namely, **Globalization, Imbalance of Power** and **Conflicting Identities**, corresponding with **Liberal, National and Radical versions of anti-Americanisms.** Finally, the contributing authors of various chapters in the book have highlighted the contextual nature of anti-Americanism in different parts of the world, thus providing a unique flavour to each. It is here that I might bring to bear the Pakistani data.

## Anti-Americanism in Pakistan

In Pakistan, anti-Americanism received its first flush in the 1960's in response to US relations with India and Pakistan. Pakistan was a US military ally within the cold war context and expected to be supported against India, which it saw as a Soviet ally. Americans looked at it differently. This clash of unmatched expectations provided the basis for 'distrust'. It was further reinforced in the war with India in 1971 on the Bangladesh issue. Pakistan-US friendship had been promoted in 'altruistic' terms as a result of which Pakistan expected greater sensitivity on its 'security' issue. It failed to get it from the US at a time when Pakistanis (notwithstanding their own faults with fellow citizens in East Pakistan) felt their country was being dismembered with the connivance of India.

A new situation arose in 1979 when the Soviet Union sent its troops in Afghanistan. Once again Pakistan felt threatened but it is time it made common cause with the United States that led to an interesting decade during which 'trust in US' continued to remain low, but views on the choice of America as a friend were quite unequivocal. Thus while around 20% placed trust in the US, many more said that if they had to choose between US and Soviet Union they would choose the US. There was nevertheless another bleeding issue. India had nuclear capability, while Pakistan still did not. Whenever relations between the two became tense, more than 50% of Pakistanis feared that if there was a war, India would use its nuclear weapons against them. In the meantime, the US was pressing Pakistan not to develop its nuclear capability. To Pakistanis it appeared that USA was insensitive to their security needs.

And finally, as the Soviet Union pulled out of Afghanistan and collapsed at home, many Pakistanis felt betrayed by America's abrupt behaviour of isolating itself from the aspirations of Afghans, and Pakistani expectations from post-war Afghanistan. This coincided with the first Gulf War in which Saddam Hussain's actions were sharply criticized by Pakistani public opinion, and Kuwait was supported, until America sent its troops in the region. At that point sympathies took a reverse turn. People began to see Saddam in the role of a defiant leader who was opposing American hegemony over Muslim lands. Views were highly pro-Saddam thereafter.

Anti-Americanism has widened and deepened in Pakistan since the Gulf War of 1990. I would like to make two generalizations:

**Principle #1**

- Firstly, it is important to **keep "advertising" in tune with the "product".** The advertising of Pakistan-US Pacts was not consistent with the product. Both sides raised hopes and created expectations which could not be matched by action. This set the stage for anti-Americanism in Pakistan. Mismatch of Expectations and Reality fuels Anti-Americanism.

**Principle #2**

- Secondly, polarity between the two super powers during Cold War permitted space for a nuanced relationship with their protégés. Mindful of the possibility that Pakistan might be wooed by Soviets, Americans stopped short of talking "too straight" and Pakistanis stopped short of becoming single-mindedly opposed to America because they were fearful of Soviet threat. During the current interlude of unipolarity the world is likely to see more single-minded Anti-Americanism, while America can also afford to adopt what the book describes as:

    "We don't care attitude." **Unchecked Global power produces wider and deeper opposition to America compared to a situation of power under check.**

Thus while there are certain generic types of anti-Americanisms, it helps to understand anti-Americanism in every country within its unique historical context.

In the section which follows the tables, I shall try to look at Anti-Americanism in the wider context of changing world order and structure of global relationships.

**Table-1**

Question:     How much trust do you have in the United States?

*Percent of Respondents*

| Year | Trustworthy (1) | Un-trustworthy (2) |
|------|-----------------|---------------------|
| 1981 | 31 | - |
| 1985 | 19 | 29 |
| 1987 | 22 | 34 |
| 1988 | 22 | 33 |
| 1989 | 24 | 31 |
| 1990 | 13 | 58 |

1. *Generally trustworthy and fairly trustworthy.*
2. *Not trustworthy and not particularly trustworthy.*

Source: Gallup Pakistan Surveys, 1981-1990

**Table -2**

Question:     If aid was offered, should Pakistan accept or reject American aid?

*Percent of Respondents*

| Year | Accept | Reject | Don't know/No response |
|------|--------|--------|------------------------|
| 1981 | 62 | 7 | 31 |
| 1987 | 43 | 25 | 25 |
| 1988 | 46 | 25 | 29 |

Source: Gallup Pakistan Surveys, 1981-1988

**Table-3**

Question:     Who in your view is a greater threat to Muslims: US or USSR?

*Percent of Respondents*

| Country | Year 1986 | Year 1999* |
|---------|-----------|------------|
| USA | 9 | 60 |
| USSR | 31 | 1 |
| Equally (threatening) | 50 | - |
| Don't know/No response | 10 | - |

* *Question wording in the two surveys were slightly different; yet a broad comparison can be made.*

Source: Gallup Pakistan Surveys, 1986, 1990.

**Table-4**

Question:    Who in your view is a stronger power, USA or USSR?

*Percent of Respondents*

| Year | USA | USSR | Equal | Don't know/No response |
|------|-----|------|-------|------------------------|
| 1979 | 34  | 21   | 18    | 27                     |
| 1980 | 26  | 31   | 23    | 20                     |
| 1981 | 26  | 26   | 20    | 28                     |
| 1984 | 25  | 19   | 25    | 31                     |
| 1988 | 28  | 15   | 38    | 19                     |

Source: Gallup Pakistan Surveys, 1979-1988

**Table-5**

Question:    If Pakistan had to choose one of the two, between USA and USSR who should it choose?

*Percent of Respondents*

| Year | USA | USSR | None/Both | Don't know/No response |
|------|-----|------|-----------|------------------------|
| 1981 | 42  | 6    | 25        | 17                     |
| 1982 | 32  | 10   | 40        | 18                     |
| 1986 | 35  | 11   | 42        | 12                     |
| 1988 | 30  | 8    | 40        | 22                     |

Source: Gallup Pakistan Surveys, 1981-1988

**Table-6**

Question:    If there was a war between India and Pakistan who would you say would be supported by USA and who by USSR.

*Percent of Respondents*

|                        | USA will support | | USSR will support |
|------------------------|------|------|-------------------|
| Country                | 1986 | 2006 | 1986              |
| Pakistan               | 31   | 20   | 2                 |
| India                  | 12   | 49   | 78                |
| Will be neutral        | 33   | 29   | 3                 |
| Don't know/No response | 24   | 2    | 17                |

Source: Gallup Pakistan Surveys 1986, 2006

**Table-7**

Question:    Would you welcome or be opposed to the prospect of friendship between

the two super powers, USA and USSR?

(Question asked in 1986)

*Percent of Respondents*

| | |
|---|---|
| Welcome | 56 |
| Oppose | 18 |
| Don't know/No response | 26 |

Source: Gallup Pakistan Surveys, 1986

**Table-8**

Question:    Would you agree or disagree with the statement that friendship between

the super powers, USA and USSR will result in colonization of small countries.

*Percent of Respondents*

| | |
|---|---|
| Agree (that it will lead to colonization) | 55 |
| Disagree | 24 |
| Don't know/No response | 21 |

Source: Gallup Pakistan Surveys, 1986

**Table-9**

Question:    If there was a war between India and Pakistan would you say India will or

will not use its nuclear weapons against Pakistan?

*Percent of respondents*

| Year | Will use | Will not | Don't know/No Response |
|---|---|---|---|
| 1982 | 44% | 14% | 40% |
| 1990 | 51% | 22% | 27% |
| 1996 | 54% | 27% | 19% |
| 1999 | 63& | 17% | 20% |

Source: Gallup Pakistan Surveys 1986

(II)


## Anti-Americanism in the Global Context

Now on the broader issue beyond Pakistan. Currently vast **majorities of the people of the world hold an opinion opposed to America's global strategy**. Opposition to America at the people level is far greater than at the regime level. Surveys show unambiguously that except for a few countries (Israel, India and to a lesser extent the three English speaking countries of Australia, Canada and UK) vast majorities of people do not endorse America's global policies and behaviour. In my assessment it results from a combination of **imbalance of power projected globally by the US, and Deficit of attention to the world by American citizens.** In their book on Anti-Americanism, Katzenstein and Keohane relate an anecdote that a person at the US Canadian border asked them: what were they doing in Canada? When told that they were researching anti-American attitudes, the custom official remarked,  "Tell them, we do not care". The remark is obviously symptomatic of an attitude, showing deficit of attention to the world by American citizens.


The American public as well as elite opinion seems to be ambiguous as well as divided on its role as a world power which seeks primacy in world politics, economy and culture. **To a certain extent many Americans are far too American to be able to provide leadership to a diverse world. In a curious fashion the policy relevant problem for the American academia is not to understand the roots of Anti-Americanism but to**

**comprehend the peculiarities of "Americanism".** The core groups of historic empires were quite amenable to diluting their own identity for the sake of becoming acceptable to the vast and colourful world in which they sought domination and control. Americans make the disputed claim that they are not looking for domination and control, but seek primacy only. In either case it is imperative that any core group aspiring to provide leadership to the world has to rise beyond its own nationalist perspective. This applies to America as much as it applied to other hegemons of history.

Americans are in a bind. Their economy is rooted in global capitalism. It has unleashed powerful currents of business and technology, which have eroded national sovereignty and opened up the door for American primacy (or hegemony) over the globe. But, at the same time Americans are tied to the political system of traditional democracy, symbolized by the pithy remark. "All politics is local" The "local" roots of American politics introduce an element of "parochialism" in American policy. Aspirants to high offices are compelled to appeal to "Americanism". It is very difficult for them to tell their voters that they are aspiring for high offices where they would make decisions that affect not just the Americans but the whole world and that they might have to rise above traditional Americanism. American leaders are elected by appealing to Americanism, yet once elected they decide for the world.

Ironically the forces unleashed by American capitalism have created a world that renders its dearest value, namely democracy, as extremely problematic. The world has recognized this 'dilemma' but many Americans do not. Just consider that at the time of

American Presidential election, a substantial proportion of the world is not only aware of its proceedings, but large numbers are willing to vicariously choose one of the contestants. In the 2002 Presidential elections, Gallup Pakistan put a question to a representative sample of Pakistani adults. "If you were voting in the American elections, who would you vote for: George Bush or Kerry"? Kerry received a resounding majority.

But, the choice was less relevant than the fact that around two thirds of men and women, belonging to a cross-section of all education and income groups, answered this question. They had enough 'empathy' and understanding of American elections to be able to volunteer an answer. The situation was not so dissimilar in other countries which carried out comparable surveys. It would be fair to infer that vast majorities of rich and poor countries feel that American President and his government makes decisions which influence their life. Even if there is lack of clarity on the subject, much of the world is vaguely troubled to feel that some of their power has been lost to the American decision makers. Yet they have no way of taming or sharing that power.   We know that democracy is about  'power sharing'. Contemplating on the history of modern forms of political democracy we figure out that it has been a history of **taming, sharing and institutionalization of power relationships in political entities which became sovereign states**. But as globalization nibbles on state sovereignty, political power has become less focused within national borders. It is much less tractable and its loci get dispersed across the globe. The 'power' which citizens of mature democracies had tamed, shared and institutionalized, is proving to be less relevant in people's lives. The sovereign national state is a body, a good part of whose  'soul' has flown out of it. Public

opinion surveys in key countries of Europe show that while their citizens are satisfied that elections are free and fair, only a minority believes they are 'ruled by the will of the people'. The proportion of citizens who feel they are ruled by the will of the people is only 15% in Netherlands and 30% in the UK. In Western Europe as a whole the figure is **30%.** Yet, in America the figure is substantially higher, where **37%** feel they are ruled by the will of the people.[2]

## CONCLUSION

Based on the data which I have analyzed in the course of writing this paper, I would like to argue that anti-Americanisms are directly related to "perceived loss of national sovereignty" in different parts of the world. People in different parts of the world feel that they and their governments are losing control over their lives. 'Power' is not being controlled or shared by them. Many among them put the blame on America. They feel this predicament is of American creation, yet America is neither willing to nor serious about addressing the issue. That explains the global prevalence of anti Americanism. But, can this formulation also explain the variety of Anti-Americanism, in particular the three varieties delineated by Katzenstein and Keohane as: Negative Opinion (as typified in Europe); Distrust (as typified in East Asia) and Bias (as typified in Middle East)? I would argue that the variety in Anti-American responses is intimately related with the "perceived ability to cope with loss of sovereignty." If perceived ability to cope is high, the intensity of anti-Americanism is low and vice versa. Europeans experience loss of

---

[2] Although the negative perception about 'free and fair elections among American public is quite alarming. In the Gallup International-Voice of the People Survey, only 54% of Americans said elections in their country were free and fair. This compares with an average of 67% in Western Europe.

sovereignty, but they are much more confident to cope with it compared to people the Middle East who feel rather helpless. Consequently European version of anti-Americanism is mild (Negative Opinion) and the Middle East variety is rather severe (Bias). The East Asian variety falls in between the two. American led globalization has encroached upon their national sovereignty, but they are reaping concrete economic benefit and hence present a somewhat measured variety of Anti-Americanism (Distrust).

Reflections on
Americanism and Anti-Americanism

## Table-10

Question:     What in your view are the chances of war between India and Pakistan these days?

| | 2006 | 2003 | 2003 | 2002 | 2001 | 1999 | 1987 | 1981 | 1981 |
|---|---|---|---|---|---|---|---|---|---|
| | July 2006 | August 2003 | January 2003 | January 2002 | July 2001 | June 1999 | My 1999 | January 1087 | October 1981 |
| High Chance | 11% | 6% | 37% | 32% | 12% | 45% | 11% | 26% | 19% |
| Moderate Chance | 44% | 44% | 55% | 53% | 43% | 42% | 35% | 36% | 28% |
| Low Chance | 44% | 47% | 8% | 14% | 44% | 6% | 34% | 12% | 16% |
| No Response/Don't know | 1% | 3% | - | 1% | 1% | 7% | 20% | 26% | 37% |
| CONTEXT | Both sides wish to appear friendly and a stalemate in Kashmir | Tensions on the borders had eased. New initiatives on Indo-Pak dialogue had set in | Tensions on the Indo-Pak border continuing | Tensions on the Indo-Pak border had started; deployment of Indian troops on borders | After Musharraf's Agra visit | In the wake of Kargil Crisis | Shortly before Kargil and after Nawaz Vajpayee meeting in Lahore | Troops concentrations on the border | Focus of regional conflict was shifting towards Afghanistan crisis |

Source: Gallup Pakistan Polls (Time Series Data on Key International Issues, 1980-2006)